## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE TECFIDERA ANTITRUST | ) | |
| LITIGATION | ) | |
| | ) | No. 24-cv-7387 |
| | ) | |
| | ) | Judge April M. Perry |
| | ) | |
| | ) | |
| | ) | |

## OPINION AND ORDER

From 2013 until August 2020, Biogen Inc. was the only pharmaceutical company selling dimethyl fumarate, a compound approved for the treatment of multiple sclerosis ("MS"). Biogen chose the name "Tecfidera" for its dimethyl fumarate drug. In August 2020, other pharmaceutical companies began launching generic versions of Tecfidera at lower prices. Due to state laws allowing (and in some states, requiring) pharmacies to fill prescriptions of brand drugs like Tecfidera with less expensive generic versions, Tecfidera sales were expected to drop.

Plaintiffs are sponsors of various member and employee health plans. As sponsors, Plaintiffs pay a portion of the costs of medicines purchased by their members. Plaintiffs engaged the services of entities called pharmacy benefit managers ("PBMs") to negotiate prices with drug companies and control drug costs for health plans and their members. This antitrust case arises from allegations that instead of steering members towards lower-cost generics, PBMs accepted payments from Biogen to direct patients away from generics to Biogen's more expensive brand products, causing Plaintiffs and similarly situated health plans to pay more for dimethyl fumarate products than they would have otherwise.

For the reasons outlined below, the Court grants Biogen's motion to dismiss Plaintiffs' claims without prejudice and grants Plaintiffs leave to amend.

## BACKGROUND

### I.    Pharmaceutical Sales in the United States

To understand the antitrust claims in this case, some background is necessary on the prescription drug system in the United States and the conditions required for generic drugs to compete with their brand counterparts.

In the United States, the sale of pharmaceuticals is regulated by the Federal Food, Drug, and Cosmetic Act ("FDCA") and its 1984 amendments (commonly referred to as the "Hatch-Waxman Amendments" or "Hatch-Waxman Act"). Doc. 27 ¶ 56. Under the FDCA, a company seeking to market a new drug must seek approval from the U.S. Food and Drug Administration ("FDA") by submitting a New Drug Application ("NDA"). *Id*. This application process is intense and requires an applying company to submit data from clinical studies showing the proposed drug is both safe and effective. 21 U.S.C. §§ 355(a), (b). Applying companies must also submit the "patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted." *Id*. §§ 335(b)(1)(viii). New drugs approved through the NDA process are generally referred to as brand-name or brand drugs.

Clinical testing and other costs associated with the NDA process can be substantial. Doc. 27 ¶ 59; *see also F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 142 (2013). However, when brand drugs enter the market, they are often protected by patents that prevent other companies from selling directly competing products. This market exclusivity period helps manufacturers recoup product development and regulatory approval costs by enabling them to charge prices for brand drugs well above their per-unit manufacturing cost. Doc. 27 ¶ 3.

Once the patents covering a brand drug expire (or are found to be invalid), competing manufacturers can begin marketing therapeutically identical versions of the brand drug, *i.e.*,

2

generics, without fear of being sued for patent infringement. Like brand manufacturers, generic manufacturers must also submit their drugs for approval by the FDA. *Id*. ¶ 59. Before the Hatch-Waxman Act, this meant undergoing the same expensive and time-consuming NDA process as brand manufacturers. *Id*. Unlike brand manufacturers, however, generic manufacturers could not rely on a period of patent-enabled market exclusivity to recoup costs associated with the clinical testing and application process. Recognizing this, Congress introduced via the Hatch-Waxman Act a new regulatory pathway to promote the development and launch of generics. This pathway, named the Abbreviated New Drug Application ("ANDA"), permits a generic manufacturer to rely on clinical studies submitted in connection with an already-approved brand drug's NDA to establish the generic's safety and efficacy. *Id*. The effect of generic entry on the market for a given drug can be significant: generics typically sell for a fraction of the cost of branded drugs, which often means generics capture more than ninety percent of the market within the first six months of availability. *Id*. ¶¶ 66-67.

Whether it is a brand or a generic, some medications require a physician's approval, *i.e.*, a prescription, to obtain. These medications are called prescription drugs. Once written, a prescription allows a patient to purchase the prescribed medicine from a pharmacy. If the patient has health insurance, she will typically pay only a portion of the drug's total price while her plan covers the remainder. This cost-sharing perk of health plan coverage is called a pharmacy benefit or prescription drug benefit.

Generics are therapeutically equivalent and typically cheaper than brand drugs, and so in an ordinary market the expectation would be that payors (here, the plan and patient) would choose the cheaper generic over a pricier brand product. However, this price-quality calculus does not play out cleanly in prescription drug markets for at least two reasons. First, the choice

3

of what medicine a patient purchases is made in part by doctors, who prescribe but shoulder none of a drug's cost, and thus have "no incentive to take the price into account." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 646 (2d Cir. 2015) ("*Namenda*"); *see also* Doc. 27 ¶¶ 51-55. Moreover, due to cost-sharing between patient and plan, patients are not incentivized to select a generic if the price they pay for the brand and generic are the same, even if the brand drug costs more to the plan. To help address this price disconnect, every state has passed laws that permit or require pharmacies to fill a patient's prescription for a brand drug by dispensing a generic, absent explicit orders to the contrary from the prescribing physician. *Id*. ¶ 62. Laws that allow or require generic substitution are known as drug substitution laws. *Id*.

Although plans do not directly select the drugs their members purchase, they can still motivate their members to select certain drugs over others through coverage and pricing decisions. Once generics become available, a plan would rather its members purchase less expensive generics, as this reduces the costs paid by the plan. To encourage the purchase of generics by members, plans engage the services of pharmacy benefit managers ("PBMs") to manage prescription drug benefits. *Id*. ¶ 69. Plaintiffs allege that PBMs are supposed to make decisions that promote the use of generic drugs whenever possible, because doing so helps control drug costs for health plans and patients. *Id*. ¶¶ 73, 80.

PBMs influence purchasing patterns in part through the creation and management of formularies. Formularies are documents created for health plan clients that identify the prescription drugs a health plan will cover. *Id*. ¶ 70. Formularies also control how much plans will reimburse the pharmacy for each drug and what the patient will pay (in the form of co-payments or co-insurance). *Id*. Plaintiffs allege that health plans can select which formularies to

use, typically accepting one of the standardized formularies created by PBMs and deferring to PBMs to make formulary management decisions. *Id.* ¶ 100.

When creating formularies, PBMs sort drugs into "tiers." *Id.* ¶ 75. A drug's tier determines what share of a drug's cost must be paid by an insured patient when a prescription is filled. *Id.* ¶ 76. Drugs in lower tiers will generally have a lower cost for patients compared to drugs in higher tiers. *Id.* ¶¶ 75-76. Because generics cost less overall, plans benefit when PBMs place generics in lower tiers than brand counterparts, as this incentivizes patients to demand or accept the generic version. *Id.* ¶ 70.[1]

A formulary may also designate certain medicines as "specialty drugs." *Id.* ¶ 87. Historically, medicines would receive "specialty" classification if they required special handling or administration; in practice, PBMs have unregulated discretion in designating a medicine as a specialty drug. *Id.* ¶¶ 87-88. Since they are often placed in a formulary's higher tiers, specialty drug designation often results in larger costs for patients. *Id.* ¶ 75.

Because of their control over formularies, Plaintiffs allege that brand manufacturers sometimes make payments to PBMs—in the form of rebates and fees—in exchange for more favorable tiering of their products relative to generic counterparts. *Id.* ¶ 93. While these payments are highly lucrative to PBMs, they can also cause plans and patients to buy more expensive brand products even when less expensive generics are available. *Id.*

## II.    Tecfidera and its Generics

MS is an autoimmune disease where a person's immune system attacks their nerves, which can lead to degenerative symptoms like blindness, loss of mobility, pain, and paralysis. *Id.*

---

[1] And in certain states, placement of a generic in a lower tier guarantees the patient will be given the generic.

¶¶ 121-22. MS cannot be cured, only continually managed through drugs and therapies. *Id*. ¶ 123-24.

In 2013, the FDA approved Biogen's dimethyl fumarate drug, Tecfidera, for the treatment of MS. *Id*. ¶ 125. The drug was a success: as Plaintiffs allege, Tecfidera was a "life-saving and life-altering drug" and a "must-have for any formulary." *Id*. ¶ 130. From 2015 to 2019, Biogen received around three billion dollars in annual U.S. sales of Tecfidera. *Id*. ¶ 126. During that time, Tecfidera was protected from generic competition by a patent. *Id*. ¶ 132. But beginning in 2017, the patent came under legal attack; in mid-2020, the patent was invalidated. *Id*. ¶¶ 132, 148, 166. In August 2020, the FDA approved an ANDA filed by Mylan Pharmaceuticals for a generic version of Tecfidera, which went to market shortly thereafter. *Id*. ¶ 173. Several other generic versions entered the dimethyl fumarate market in the subsequent months. *Id*. The effect of these entries on price was dramatic. Within seven months of entering the market, generic dimethyl fumarate was selling for as low as $17 per pill compared to Tecfidera's per-pill price of $132. *Id*. ¶ 182.

### III. Alleged Anticompetitive Scheme

Plaintiffs allege that despite the launch of generic dimethyl fumarate, plans and patients could not access these lower cost generics due to a two-part scheme by Biogen to impede competition. First, Biogen made payments to PBMs in exchange for PBMs not favoring generic dimethyl fumarate on their formularies, which impeded the substitution of generic dimethyl fumarate for Tecfidera. Second, Plaintiffs allege Biogen endeavored to switch patients from Tecfidera to a new brand product, Vumerity, another MS drug that had no generic equivalent.

Specifically, Plaintiffs allege that Biogen made payments to various PBMs, including the nation's three largest—CVS Caremark, Express Scripts, and OptumRx—in exchange for those

PBMs disadvantaging on their formularies generic dimethyl fumarate relative to Tecfidera or Vumerity. *Id*. ¶ 183. Biogen's payments took the form of rebates and fees that resulted in PBMs taking three actions that hindered generic dimethyl fumarate. *Id*. First, Plaintiffs allege the payments led PBMs to not place generic dimethyl fumarate in a more favorable formulary tier than Tecfidera. *Id*. ¶¶ 210, 218, 226. Second, PBMs often classified generic dimethyl fumarate as a specialty drug. *Id*. ¶¶ 211, 220, 227. Third, PBMs did not place generic dimethyl fumarate in the most favorable possible formulary tier, where generics are often placed. *Id*. ¶¶ 212, 220, 228. These tiering changes affected some, not all, of the formularies created by the conspiring PBMs. For affected formularies, however, these decisions apparently derailed the normal operation of drug substitution laws, causing plans to continue buying brand Tecfidera when less expensive generics were available. This prevented generic dimethyl fumarate from capturing the market share that would be expected absent the conspiracy. *Id*. ¶¶ 236-37, 247.

In December 2018, Biogen submitted an NDA for Vumerity, which was subsequently approved by the FDA for the treatment of MS. *Id*. ¶¶ 135, 148. Although Vumerity and Tecfidera have different molecular structures and dosing regimes, both are metabolized by the body into the same active ingredient, and Biogen relied on clinical studies conducted to test Tecfidera's safety and efficacy when seeking approval of Vumerity. *Id*. ¶¶ 136-38. Sales of Vumerity began in October 2019. *Id*. ¶ 145. Unlike Tecfidera, Vumerity's protective patents do not expire until October 2033, which means Vumerity has no generic equivalent. *Id*. ¶¶ 6, 134, 250-51.

To switch patients from Tecfidera to Vumerity, Biogen planned to rely on direct marketing by Biogen sales teams to convince doctors and patients to switch from Tecfidera to

Vumerity. *Id*. ¶¶ 162, 169-70. Between June 2020 and June 2021, Vumerity sales leapt from 50,000 to 423,000 units a month. *Id*. ¶ 236.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in a plaintiff's complaint and draws all reasonable inferences from those facts in a plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016). "While a complaint … does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

## ANALYSIS

Plaintiffs seek damages and injunctive relief under Sections 1 and 2 of the Sherman Act, as well as various state antitrust laws that, for the most part, track Plaintiffs' Sherman Act theories. Plaintiffs also bring a commercial bribery claim under the Robinson-Patman Act, 15 U.S.C. § 13(c).

## I.   Antitrust Claims

Biogen argues that Plaintiffs' allegations fail to adequately plead cognizable antitrust claims, and also that Plaintiffs are legally barred from pursuing this antitrust action due to the lack of directness between themselves and the injuries allegedly suffered. For the following reasons, the Court agrees that the complaint as currently pled fails on both levels.

8

### a. Sherman Act Claims

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334-35 (7th Cir. 2012). Section 1 of the Sherman Act outlaws any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To plead a Section 1 claim, a plaintiff must plead facts suggesting: (1) a contract, combination, or conspiracy (meaning, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying "antitrust injury." *See Agnew*, 683 F.3d at 335. "[T]he determination of whether a restraint is unreasonable must focus on the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." *Id*.

Section 2 imposes liability on "[e]very person who shall … combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To plead a Section 2 conspiracy, a plaintiff "must prove 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540-41 (7th Cir. 1986).

Plaintiffs have alleged unlawful conspiracies under both Section 1 and Section 2 of the Sherman Act. When a plaintiff adequately pleads a Section 2 conspiracy claim, it follows that an alternatively pled Section 1 claim predicated on the same conspiracy also survives. *See* Richard A. Posner, Antitrust Law: An Economic Perspective 216 (1976) ("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade ...."). In their complaint and briefing, Plaintiffs do not distinguish between an overarching conspiracy by Biogen to

restrain trade, on the one hand, and extend its monopoly in the dimethyl fumarate market, on the other. Accordingly, the Court will analyze Biogen's dismissal arguments as to the Section 1 and Section 2 claims simultaneously, as they appear to be "entirely coterminous." *In re Surescripts Antitrust Litig.*, 608 F.Supp.3d 629, 651 (N.D. Ill. 2022) (applying same analysis to Section 1 and Section 2 claims).

Biogen and Plaintiffs dispute what framework the Court should use to evaluate Plaintiffs' antitrust claims. Biogen argues that Plaintiffs have tried (and failed) to plead two well-established theories of antitrust harm: a series of unlawful exclusive dealing agreements between Biogen and PBMs and a "product hop" claim focused on Biogen's efforts to switch patients from Tecfidera to Vumerity. *See* Doc. 60 at 21. Plaintiffs argue that these are not the claims they press at all, and contend that Biogen has deliberately mischaracterized their claims in order to hold Plaintiffs to an inapplicably high pleading standard. Doc. 64 at 11.

The Court need not dwell too long on the question of labels. Activities that violate the antitrust laws are often "susceptible to more than one court-defined category of anticompetitive conduct." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020); *see also Siva v. Am. Bd. Of Radiology*, 38 F.4th 569, 572 (7th Cir. 2022) (warning that in antitrust cases, "easy labels do not always supply ready answers"). It is true that through "time and a gathering body of experience," courts have identified "common forms of alleged misconduct" and developed "specific rules" to aid in their analysis. *In re EpiPen*, 44 F.4th 959, 981-92 (10th Cir. 2022). But ultimately, the Court's task is to determine whether an alleged course of conduct "harm[s] the competitive process and thereby harm[s] consumers," regardless of whether it fits into a familiar category of antitrust violation. *Viamedia*, 951 F.3d at 453, citing *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). Having considered Plaintiffs' allegations, the Court will

10

address first the payments Biogen made to PBMs and the effect of those payments on the market for dimethyl fumarate products before turning to Plaintiffs' allegations regarding Vumerity.

### i. Payments to PBMs

Plaintiffs allege that Biogen violated the antitrust laws when it paid PBMs "to not promote or advantage generic Tecfidera" over Biogen's brand products. *Id*. ¶ 183. The alleged purpose of this scheme was to impair the ability of Biogen's rivals—generic manufacturers—to compete in the dimethyl fumarate market, while also allowing more time for Biogen to encourage doctors and patients to switch from Tecfidera to Vumerity.

Biogen asserts that the alleged payments-to-not-promote should be analyzed as exclusive dealing arrangements. *See* Doc. 60 at 21. As commonly understood, "[a]n exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 46 (7th Cir. 1996). Exclusive dealing arrangements are not uniformly condemned under the antitrust laws and only raise anticompetitive concerns "when they foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco Co. v. North Atl. Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004). Substantial foreclosure may be found where an exclusive arrangement is "likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and "the probable … effect of the [rival's] exclusion will be to raise prices above the competitive level, or otherwise injure competition." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 394 (7th Cir. 1984). Risk of foreclosure is especially pronounced when a firm that already has a "dominant position in the market" enters an exclusive dealing agreement that offers the firm "a realistic hope of obtaining [or preserving] at least some degree of monopoly power." *Prods. Liab. Ins. Agency v. Crum & Forster Ins. Co.*, 682 F.2d 660, 664 (7th Cir. 1982).

11

Because they can have both procompetitive and anticompetitive effects, courts analyze exclusive dealing agreements under the rule of reason. *Republic Tobacco Co.*, 381 F.3d at 736. Under this framework, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Marion Diagnostic Ctr., LLC v. Becton Dickinson Co.*, 29 F.4th 337, 348 (7th Cir. 2022) (citing *Continental T. V., Inc., v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). On a motion to dismiss, all that is required for "adequate pleading in a rule of reason antitrust case" are some plausible allegations of "market structure (i.e., market power and relevant markets …) and … exclusionary effect (i.e. foreclosure of a competitor from a market) … indicat[ing] that an antitrust violation is plausible." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (quoting Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 90 (2018)).

The Court takes from Plaintiffs' complaint that Biogen's alleged payments kept generic manufacturers from competing with Biogen on the merits, and that this allowed Biogen to preserve and extend its dominant position in the market. Denying competitors the means to effectively compete to the detriment of consumers is precisely the concern raised by exclusive dealing agreements. Accordingly, the Court will apply the substantial foreclosure analysis used to analyze exclusive dealing agreements in its analysis of Plaintiffs' payments-to-PBMs theory of anticompetitive harm.

Biogen argues that the alleged scheme did not prevent Biogen's generic competitors from competing in the market for dimethyl fumarate products. Biogen specifically highlights that (1) generic manufacturers were still able to launch their products and gain market share, (2) generic versions of dimethyl fumarate were not excluded from formularies, and (3) the formularies

12

supposedly affected by Biogen's agreements with PBMs covered only between 20% and 31% of patients between 2020 and 2023. Doc. 60 at 29-30.

To address this argument, the Court must first determine what foreclosure means in the context of prescription drug markets. When a challenged restraint is subject to rule of reason analysis, it must be evaluated in light of "specific information about the relevant business," the "restraint's history, nature, and effect," and "[w]hether the businesses involved have market power." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007); *see also Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."). Moreover, when an alleged exclusive dealing agreement entrenches a dominant firm's position in a market, a restraint that does not bar rivals "from all means of distribution" may still be anticompetitive "if they are barred from the cost-efficient ones." *Namenda*, 787 F.3d 638, 656 (2d Cir. 2015), citing *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001).

As alleged, healthy competition in prescription drug markets requires the smooth operation of drug substitution laws, insofar as these laws provide generic manufacturers with the only cost-efficient and commercially viable means to compete. Doc. 27 ¶¶ 109, 161, 246-47. Courts recognizing this have credited antitrust claims premised on restraints and conduct that undermine the operation of these laws. *See, e.g.*, *Namenda,* 787 F.3d at 654 (concluding conduct was likely anticompetitive where it had effect of "precluding generic substitution through state drug substitution laws"). As such, the Court will focus its foreclosure analysis on whether the alleged scheme disrupted drug substitution laws with respect to Tecfidera, and the degree to which this disruption prevented generic manufacturers from competing effectively with Biogen,

13

rather than whether it totally prevented generic launch or stopped the placement of generics on formularies.

Plaintiffs allege that one consequence of Biogen's payments to PBMs was that on some formularies, generic dimethyl fumarate was not given more favorable tiering than brand Tecfidera. According to Plaintiffs, this ensured that "[e]ven though generic Tecfidera was *available for sale* … it was *not in fact dispensed to patients*." Doc. 27 ¶¶ 176 (emphasis in original).

Here, the Court encounters a major problem with Plaintiffs' complaint, which is that Plaintiffs have not explained how drug substitution laws actually work. They allege that substitution laws "require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions" and that "[a]utomatic substitution at the pharmacy counter is a generic product's only commercially viable means of competing." Doc. 27 ¶¶ 62, 109. But if the only requirement for substitution was the availability of a therapeutically equivalent generic, then Biogen would be correct that the alleged scheme did nothing to prevent substitution.

At oral argument, Plaintiffs provided more detail about how substitution laws operate. Specifically, counsel informed the Court that in the majority of U.S. jurisdictions, substitution of a generic for a brand is not allowed unless the patient's out-of-pocket cost for the generic is less than the patient's out-of-pocket cost for the brand. Doc. 95 at 27:1-16. This context is vital to understanding how the alleged scheme could harm competition even though generics were on the market and less expensive than Tecfidera. Plaintiffs allege that Biogen paid PBMs to not advantage generic dimethyl fumarate over Tecfidera, and that as a result PBMs tiered the generics the same as Tecfidera. If equivalent tiering meant that patients would pay the same price for the generic as they would for Tecfidera, then substitution would not occur in jurisdictions that

only allow substitution when a generic costs the patient less.[2] Consequently, plans using formularies affected by the alleged scheme would end up paying for Tecfidera despite the existence of a less expensive generic.

Without these allegations in their complaint, the Court cannot say Plaintiffs have plausibly alleged foreclosure. Given the discussion at oral argument, however, the Court is optimistic that Plaintiffs could amend their complaint to add these allegations and allow the Court to reasonably infer that—in at least some U.S. jurisdictions—Biogen entered an agreement with certain PBMs to not give generic dimethyl fumarate more favorable formulary tiering than Biogen's brand products, and that this foreclosed competition by disrupting the operation of state substitution laws.[3]

---

[2] This would only be the case for plans that have co-pays (*e.g.*, the patients pay $30 for any Tier 2 drug) as opposed to co-insurance (*e.g.*, the patient pays 30% of any Tier 2 drug). Equivalent tiering in a co-insurance plan would still allow drug substitution laws to operate as intended, because generic dimethyl fumarate costs significantly less than Tecfidera. Whether the Plaintiffs' plans used co-pays or co-insurance is another important contextual fact currently missing from the complaint.

[3] The Court is not convinced that the designation of generic Tecfidera as a specialty drug on the formularies supports an inference of an antitrust violation separate and apart from the disruption of state substitution laws. Plaintiffs assert that PBMs that accepted Biogen's payments designated generic dimethyl fumarate as a specialty drug, increasing its cost to patients and making acquisition more difficult. But Plaintiffs do not assert that this specialty designation was part of the agreement between Biogen and PBMs. The agreement that Biogen is alleged to have made is that the PBMs could not "promote or advantage generic Tecfidera over brand Tecfidera or Vumerity." Doc. 27 ¶ 183. The Court believes there is a difference from an antitrust perspective between a demand to be treated equally to a competitor and a demand that the competitor be disadvantaged. At oral argument, Plaintiffs' counsel informed the Court that Tecfidera and Vumerity were also designated as specialty drugs, meaning the generic and branded drugs were treated the same. The Court does not see from the current allegations how this is anti-competitive. What is more troubling is the pricing by the specialty pharmacies, which apparently charged $3,857 for a 30-day supply of generic Tecfidera that they had obtained for $180. *Id.* ¶¶ 198-199. But the complaint as currently pled does not support an inference that this inflated pricing is attributable to any agreement between Biogen and the PBMs. Plaintiffs' counsel agreed at oral argument that pharmacies set their own pricing. While the complaint alleges that "Biogen's co-conspirator PBMs owned specialty pharmacies," *id.* ¶ 15, there is no plausible non-conclusory allegation that the specialty pharmacies were aware of, or joined, any conspiracy. Plaintiffs have alleged that the PBMs and specialty pharmacies were separate corporate entities. *Id.* ¶¶ 35-46. To the extent Plaintiffs expect the actions of the specialty pharmacies to be attributable to the conspiracy, the complaint will need significantly more to make such an inference plausible.

The Court turns next to whether the degree of foreclosure alleged by Plaintiffs is "substantial" enough to sustain their antitrust claim. Substantial foreclosure exists when "the opportunities for other traders to enter into or remain in [a] market [are] significantly limited." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). Determining substantiality requires the Court to consider such factors as the "relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition." *Id.* at 329.

Biogen cites *U.S. v. Microsoft* to argue that substantial foreclosure requires a showing that the challenged restraints excluded competitors from "roughly 40% or 50%" of the alleged market. Doc. 60 at 29-30, citing *U.S. v. Microsoft*, 253 F.3d 34, 70 (D.C. Cir. 2001). What *Microsoft* actually held was that percent benchmarks in exclusive dealing cases are a "prudential" consideration and that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Microsoft*, 253 F.3d at 70. Thus, while percents are helpful, too much focus on specific thresholds risks losing the forest for the trees. What fails to read as substantial in one market, in terms of percent, may suffice to find foreclosure in another market with different dynamics at play. *See, e.g.*, *Standard Oil Co. of California v. United States*, 337 U.S. 293, 296 (1949) (substantial foreclosure found by exclusive contracts covering 16% of retail outlets in the relevant market).

Plaintiffs allege that OptumRx, Caremark, and Express Scripts manage pharmacy benefits for 22%, 34%, and 23% of U.S. patients, respectively. Doc. 27 ¶¶ 205, 214, 221. In 2021, when Biogen's payments to PBMs were highest, these three PBMs did not give generic

16

dimethyl fumarate better formulary treatment than brand Tecfidera on formularies covering 49%, 38%, and 34% of their covered patients, respectively. *Id.* ¶¶ 210, 218, 226. By the Court's calculation, that means decisions by alleged co-conspirators OptumRx, Caremark, and Express Scripts resulted in around 31% of U.S. patients being covered by formularies that did not give generic dimethyl fumarate better treatment than its brand counterpart. This falls short of the 45% of patients that Plaintiffs allege were subject to formularies that did not favor generic dimethyl fumarate over brand Tecfidera. *Id.* ¶ 230. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court understands this to mean that PBMs other than OptumRx, Caremark, and Express Scripts were also induced by Biogen's alleged payment scheme to make formulary tiering decisions unfavorable to generic dimethyl fumarate.

While the Court has no issue with the exact percent threshold *per se*, there is a larger obstacle to the plausibility of Plaintiffs' foreclosure allegations. Plaintiffs explain that PBMs—including the three identified co-conspiring PBMs—create multiple formularies, not all of which disadvantaged generic dimethyl fumarate. Indeed, Plaintiffs allege that the majority of patients with pharmacy benefits managed by one of the three identified co-conspirator PBMs were *not* subject to a formulary with any of the alleged anticompetitive features. They allege further that health plans "choose which pharmacy networks and drug formularies to use" and so "most health plans accept the standard formularies that the PBMs offer." Doc. 27 ¶ 100. This begs the question: if plans could select formularies lacking any problematic tiering features, what stopped them from doing so and reaping the competitive benefits of state substitution laws?

When this issue arose at oral argument, Plaintiffs suggested that information asymmetries and deference to PBMs on matters of formulary management make it impractical for plans to "ferret out" schemes like the one alleged in the complaint. Doc. 95 at 41:22-42:20. Similar

allegations were made in Plaintiffs' complaint. Doc. 27 ¶ 100. This explanation seems implausible, given that the majority of U.S. patients (and their sponsoring plans) seem to have avoided the allegedly problematic formulary schemes altogether. After all, Plaintiffs allege that plans "may choose which pharmacy networks and drug formularies to use," which suggests to the Court that plans have the freedom to select formularies that suit their needs and reject ones that do not. *Id*.

Maybe there is more to the story. Perhaps some health plans enjoy more leverage or ability to select among formularies or PBMs, and these plans are different in kind and cannot be compared to those that make up the proposed plaintiff class. Or perhaps there is something else to the power dynamic between plans and PBMs to explain why at least some plans cannot avoid formularies with problematic features.[4] At present, however, the dearth of allegations regarding how plans select formularies from among a PBM's offerings means the Court can only speculate, and speculation will not do to bridge the gap from possible to plausible foreclosure.

Accordingly, the Court concludes that Plaintiffs have not adequately pled substantial foreclosure of generic competition as a result of the alleged scheme. If plans can, and apparently do, choose formularies lacking the features complained of in Plaintiffs' allegations, the Court cannot see how generic competition was meaningfully stifled in the market for dimethyl fumarate products to Biogen's advantage. As such, Plaintiffs' antitrust claims premised on the exclusionary effect of payments by Biogen to PBMs are dismissed without prejudice for failure to state a claim.

---

[4] At oral argument, the Court asked Plaintiffs whether PBMs had done anything to steer, force, or coerce plans to select formularies with problematic features, but Plaintiffs did not at that time express knowledge of any such conduct. *See* Doc. 95 at 45:18-46:6.

### ii. Product hop claim

The Court turns to Plaintiffs' claim regarding Biogen's efforts to migrate Tecfidera patients to Vumerity. Plaintiffs contend that they do not press a product hop theory, but since they argue nonetheless that they have stated an actionable product hop claim, the Court will address the issue.

The Seventh Circuit has not decided a product hop case, and so the Court looks to a leading pharmaceutical product hop case from another Circuit, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("*Namenda*"). *Namenda* involved Actavis PLC, a pharmaceutical company, and its brand drug Namenda IR. *Id*. at 642. As Namenda IR was approaching the end of its patent protection and prior to generic entry, Actavis introduced Namenda XR, a follow-on product "with the same active ingredient and the same therapeutic effect" but not subject to generic substitution due to its different strength and dosing regimen. *Id*. at 647. Promotional efforts by Actavis to switch patients and doctors from Namenda IR to XR were only mildly successful, with internal company projections estimating that only 30% of patients would voluntarily switch to XR before generic market entry. *Id*. at 648. So Actavis changed its strategy. It announced plans to withdraw Namenda IR from the market entirely, which would force most patients on Namenda IR regimens to switch to Namenda XR, as this would be the only reasonable substitute before generic entry. *Id*. The State of New York sued, seeking a preliminary injunction barring Actavis from withdrawing Namenda IR on the theory that Actavis's planned withdrawal was intended to thwart generic entry by derailing the operation of drug substitution laws. *Id*. at 649. After a five-day hearing, the district court granted the injunction, and Actavis appealed. *Id*. at 649-50.

The Second Circuit upheld the injunction. It noted that while "[p]roduct innovation generally benefits consumers" by providing more choices, "product redesign is anticompetitive when it coerces consumers and impedes competition." *Id*. at 652. Thus, while recognizing that "neither product withdrawal nor product improvement alone is anticompetitive," the Second Circuit determined that the combination of product withdrawal with other conduct, "the overall effect of which is to coerce consumers rather than persuade them on the merits … and to impede competition …are anticompetitive under the Sherman Act." *Id*. at 653-54. Regarding coercion specifically, the Second Circuit found that the withdrawal of Namenda IR before generic entry would prevent doctors and patients from "evaluat[ing] the products and their generics on the merits in furtherance of competitive objectives." *Id*. at 654.

Consistent with *Namenda*, other courts look for new product launch paired with some type of coercive conduct when evaluating product hop claims. *See*, *e.g.*, *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 440 (3d Cir. 2016) (holding antitrust liability could arise from "certain insignificant design or formula changes, combined with other coercive conduct"); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F.Supp.3d 274, 330 (D.R.I. 2019) (product hop claims requires "evidence that [defendant's] anticompetitive conduct coerced consumers to switch" products); *In re HIV Antitrust Litig.*, 656 F.Supp.3d 963, 977 (N.D. Cal. 2023) ("*HIV*") (describing coercion element in product hop cases).

Plaintiffs argue that they need not allege coercion because they have alleged a concerted scheme between Biogen and PBMs to switch patients to Vumerity, whereas the product hop cases where courts first articulated the coercion requirement all involved unilateral conduct. *See* Doc. 64 at 17. The Court is not persuaded. Plaintiffs cite no cases nor offer any reason why the Court should abandon the element of coercion when evaluating a product hop case. And the

Court believes that the element of coercion is vital in distinguishing conduct that preserves and expands consumer choice from conduct that prevents competition on the merits. Accordingly, the Court will evaluate whether Plaintiffs have alleged coercion.

Biogen points out that Plaintiffs do not allege Tecfidera's withdrawal from the market, and that this is sufficient grounds for dismissal. But total withdrawal is not strictly necessary to coerce consumers to switch to a new product. *See, e.g., HIV*, 656 F.Supp.3d at 977 (concluding "withdrawal of an old product is not the only means of coercion"); *Mylan Pharms.*, 838 F.3d at 440 (same). That said, Plaintiffs must still point to some alleged conduct by Biogen and its co-conspirators that forced patients and doctors to switch to the follow-on product (here, Vumerity) for reasons other than the merits.

Plaintiffs argue that Biogen coerced doctors and patients to switch to Vumerity through a number of means. First, they allege that Biogen's payments to PBMs made generic dimethyl fumarate cost at least as much to patients as brand Tecfidera, resulting in the generics not being substitutable under drug substitution laws. *See* Doc. 64 at 19. The Court does not see how this would coerce doctors and patients to switch to Vumerity. Plaintiffs have alleged that physicians do not choose what therapies to prescribe based on cost. Doc. 27 ¶¶ 52-53. The Court can see how making generic dimethyl fumarate more expensive to patients would keep them on Tecfidera, but not how it would coerce doctors to switch patients to Vumerity.

Plaintiffs also allege Biogen "misled purchasers and doctors about the … comparative medical merits" of Tecfidera and Vumerity, which presumably coerced patients and doctors to switch to Vumerity. Doc. 64 at 20. The problem with this argument is that Plaintiffs have not alleged any misleading falsehoods to physicians. Plaintiffs have made allegations suggesting Vumerity's inferiority to Tecfidera, including its higher pill burden, but they have not alleged

that Biogen hid this fact from doctors. Doc. 27 ¶¶ 142-45. Plaintiffs have also alleged that Vumerity was marketed on the premise that it leads to fewer side effects. *Id.* ¶ 139. Plaintiffs have not alleged that this was false, just that the benefits were in Plaintiffs' opinion minimal, and that doctors did not find the statements compelling. *Id.* ¶¶ 139-140. None of these allegations are sufficient to allege that Biogen coerced doctors to prescribe Vumerity.

Last, Plaintiffs assert that Biogen caused PBMs to designate generic dimethyl fumarate as a specialty drug, making it more expensive for patients. Again, the Court does not see how this would coerce patients on Tecfidera regimens to switch to Vumerity, which was also a specialty drug. *See* Doc. 95 at 32:8-10. Had Biogen arranged for brand Tecfidera and its generic counterparts to be designated specialty drugs while Vumerity escaped that designation, the Court might be convinced that Biogen had reduced Tecfidera's commercial availability in a coercive way. *See HIV*, 656 F.Supp.3d at 977 (hypothesizing that coercion would occur if a pharmaceutical company started charging an exorbitant price for an old drug while pricing the new drug considerably less); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F.Supp.3d 274, 330 (D.R.I. 2019) (anticompetitive product hop may occur even if "branded product remains on the market in some limited fashion"). But Plaintiffs made no such allegations, so the Court does not see how specialty designation would coerce a switch in drugs.

In summary, the Court finds Plaintiffs have not plausibly alleged that Biogen's introduction of Vumerity was paired with coercive conduct, as necessary to state a viable product hop claim.

### b. Whether Plaintiffs are proper antitrust plaintiffs

As an independent ground for dismissal of Plaintiffs' antitrust claims, Biogen argues that Plaintiffs are not proper plaintiffs to bring this antitrust suit. While the Court's conclusion that

Plaintiffs have not pled a plausible antitrust claim would normally mean the Court does not have to address these arguments, it will do so in the event that Plaintiffs choose to amend their complaint, and on the hope that doing so will help focus any amended complaint on what the Court sees as this case's core issues.

Antitrust suits by private parties are permitted by Section 4 of the Clayton Act, 15 U.S.C. § 15, but "courts have long acknowledged that not every person, however tangentially injured by an antitrust violator, may recover treble damages." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002). As a result, "[n]umerous doctrines have arisen to clarify the circumstances under which a particular person may recover from an antitrust violator." *Id.* These collected threshold doctrines are sometimes "lumped together under the umbrella term of 'antitrust standing.'" *Id*.

Biogen contends that two antitrust limiting doctrines apply to Plaintiffs. First, Biogen argues that the direct purchaser rule laid out in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) bars Plaintiffs from pursuing their antitrust claims for money damages. *Illinois Brick* instructs that "a downstream plaintiff cannot sue an alleged monopolist or cartel member on a theory that a middleman passed an anticompetitive overcharge on to her." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020). The purpose of this rule is to reduce "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474-75 (1982). By the same token, no *Illinois Brick* concerns are implicated if allowing an antitrust claim to proceed does not risk "the slightest possibility of duplicative exaction." *Id*. at 475.

The Court sees a path that avoids issues with *Illinois Brick*, to the extent Plaintiffs' scheme is predicated on Biogen and PBMs agreeing to manipulate formularies. Under such a scheme, plans and their members are the first payors in the chain of distribution to pay more for dimethyl fumarate products. However, this theory of the case is contradicted by Plaintiffs' allegation in the complaint that "[w]holesalers and retailers passed on the inflated prices of fumarate drugs to Plaintiffs and Class members." Doc. 27 ¶ 296. The Court is unsure what to make of this allegation, given its understanding of how the alleged scheme operated. If Plaintiffs choose to amend, the Court suggests that they reconsider or better contextualize this allegation to explain how formulary tiering decisions would affect the price that retail pharmacies or wholesalers pay for dimethyl fumarate products and to do so with *Illinois Brick* in mind.

Biogen next argues that Plaintiffs' request for injunctive relief is barred for lack of directness. In *Associated General Contractors, Inc. v. California State Council of Carpenters*, the Supreme Court laid out a number of factors courts must consider when determining whether plaintiffs are proper parties to bring an antitrust suit. 459 U.S. 519, 537-45 (1983); *see also Sanner v. Bd. Of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995) (laying out factors). The directness between the plaintiff's injury and the at-issue restraint is one such factor, and the only one Biogen challenges in its briefing. Since the Court has concluded that Plaintiffs are the most directly injured victims of the scheme that the Court has described above, it rejects Biogen's argument that Plaintiffs' claim for injunctive relief is barred for lack of directness.

In addition to Biogen's arguments, however, the Court notes that nowhere do Plaintiffs allege that they used the services of any co-conspiring PBMs or that their members were subject to any formulary tainted by the alleged scheme. This itself is grounds for dismissal, as the Court's view is that only plans using a formulary authored by a co-conspiring PBM and

24

containing the complained-of tiering problems would be injured by the alleged anticompetitive scheme. At oral argument, Plaintiffs conceded that those allegations were missing from the current complaint but confirmed that each named plaintiff engaged one of the co-conspirator PBMs for their formulary management services and used a formulary affected by the scheme. Doc. 95 at 20:7-21:23. Without belaboring the point, these allegations are necessary for Plaintiffs' claims to proceed, and so the Court expects them to appear in an amended complaint, should Plaintiffs choose to file one.

### IV. Robinson-Patman Act Claim

Plaintiffs also bring a commercial bribery claim under Section 2(c) of the Robinson-Patman Act ("RPA"). Section 2(c) of the RPA states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Section 2(c) of the RPA reaches commercial bribery claims. *Grace v. E. J. Kozin Co.*, 538 F.2d 170, 173 (7th Cir. 1976). For purposes of resolving the present motion, the Court will focus on just one element of stating such a claim, which is whether Plaintiffs have plausibly alleged a fiduciary relationship between them and the PBMs.

Bringing a commercial bribery claim under Section 2(c) requires Plaintiffs to allege that PBMs breached a fiduciary duty owed to Plaintiffs. *See id.* (purpose of Section 2(c) is "to protect the integrity of the principal-agent relationship where a violation has an anti-competitive effect."); *see also 2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 737 n.

25

4 (3d Cir. 2004) ("As a general principle, a critical element of commercial bribery is the breach of the duty of fidelity"); *Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.3d 1272, 1274 n.3 (9th Cir. 1991) ("Section 2(c) … can be read to prohibit commercial bribery where a fiduciary relationship exists.").

Under Illinois law,[5] "a fiduciary duty arises either as a matter of law or by special circumstances." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). Certain common relationships give rise to a fiduciary duty "as a matter of law, such as [the relationship] between an agent and principal." *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013). Alternatively, a "fiduciary relationship and the attendant duties may arise as a result of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997). In determining whether special circumstances merit imposing a fiduciary duty, the Court recognizes that the "essence of a fiduciary relationship is that one party is dominated by the other." *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992); *see also Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990) (fiduciary relation arises if "one person has reposed trust and confidence in another who thereby gains influence and superiority over the other."). A fiduciary relationship does not arise simply because "one party trusts the other," and a "slightly dominant business position … does not operate to turn a formal contractual relationship into a … fiduciary relationship. *Pommier*, 967 F.2d at 1119 (internal citations omitted). Nor does the possession of "knowledge and expertise" transform "every

---

[5] Plaintiffs argues that Illinois law supplies the relevant test for determining whether a fiduciary duty exists. Biogen questions whether federal or state law applies but argues it prevails under Illinois law in any event, *See* Doc. 69 at 17 n.7, and so the Court applies Illinois law.

expert automatically [into] a fiduciary." *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992).

Rather, the common law fiduciary duty arises only when a person "solicits another to trust him in

matters in which he represents himself to be expert as well as trustworthy and the other is not

expert and accepts the offer and reposes complete trust in him." *Id.*

Although Plaintiffs describe PBMs as "agents" of health plans, *see* Doc. 27 ¶¶ 185-86,

188, 249, this is a legal conclusion unsupported by the currently alleged facts. The test of agency

under Illinois law "is whether the alleged principal has a right to control the manner and method

in which work is carried out by the alleged agent and whether the alleged agent can affect the

legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742,

745 (7th Cir. 1998). The Court finds no allegations in the current complaint to suggest Plaintiffs

exerted any control over the conduct of PBMs as to formulary management. Rather, Plaintiffs

allege that "[h]ealth plans rely on PBMs to control decisions about formulary inclusion and

placement" and that PBMs enjoy "unregulated discretion" in formulary decisions such as

specialty drug classification. Doc. 27 ¶¶ 88, 324. These are not the hallmarks of a principal-

agency relationship giving rise to a fiduciary duty owed by PBMs.

That leaves a fiduciary relationship arising from "special circumstances," as when one

person solicits and secures another's trust based on professed expertise. *Burdett*, 957 F.2d at

1381. Plaintiffs allege that plans hire PBMs to negotiate drug costs with manufacturers on their

behalf, and that they rely on PBMs to use their skill, knowledge, and influence to help them

reduce prescription drug costs. Doc. 27 ¶¶ 18, 324. They allege further that PBMs "have, and

hold themselves out as having, superior knowledge and expertise" about formulary management

and drug price negotiation, and that PBMs "tell their health plan clients and the public that they

help health plans reduce the costs associated with providing prescription drugs to plan subscribers." *Id.* ¶¶ 323-24.

Plaintiffs urge the Court to conclude from these allegations that PBMs owe a fiduciary relationship to health plans, consistent with two other districts to have considered the issue. *See* Doc. 64 at 30-31, citing *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166 (D. Minn. Jan. 15, 2021) ("*EpiPen*") and *In re Express Scripts, Inc., PBM Litig.*, 522 F.Supp.2d 1132, 1144-45 (E.D. Mo. 2007) ("*Express Scripts*"). But on review, the Court notes that in both *EpiPen* and *Express Scripts*, specific marketing statements by PBMs were alleged to support the inference that they held themselves out as trustworthy experts in formulary design. *See EpiPen*, 2021 WL 14166, at *18 (noting that the complaint alleged several public marketing statements by PBMs that they would "align their interests and/or act in the best interest of their clients … and that they were uniquely positioned to achieve lower costs"); *Express Scripts*, 522 F.Supp.3d at 1145 n.10 (alleging pledge by PBM defendant to "align our interest with those of our clients" and "promote generic drugs and lower cost brand-name drugs and never switch to high cost drugs").

Here, by contrast, Plaintiffs allege no specific marketing statements. Instead, Plaintiffs make only the general allegation that PBMs hold themselves out to the public as representing the best interests of plans and plan subscribers. *See* Doc. 27 ¶¶ 323-24. The Court hazards a guess that every service provider—from a hair stylist to a car dealer—claims to have the best interest of his clients in mind. More is required for a fiduciary relationship to form. "While a complaint … does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th

Cir. 2016). The current allegations in the complaint do not lead to a plausible inference of a fiduciary relationship.

Because the owing and breach of a fiduciary duty is an element that must be plausibly alleged to state a commercial bribery claim under Section 2(c), the Court dismisses Plaintiffs' Robinson-Patman Act claim without prejudice. If they so choose, Plaintiffs have the opportunity to amend their complaint and supply more allegations demonstrating the basis of a fiduciary relationship and the concomitant duties owed to them by PBMs.

## CONCLUSION

For the foregoing reasons, Biogen's motion to dismiss is granted in its entirety. Dismissal is without prejudice and Plaintiffs have leave to amend on or before August 20, 2025.

Dated: June 25, 2025

_____
APRIL M. PERRY
United States District Judge