# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

*In re Tecfidera Antitrust Litigation*

Case No. 1:24-cv-07387

Hon. April M. Perry

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT BIOGEN INC.'S MOTION TO DISMISS
## PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    Industry background ...........................................................................................3

    B.    The parties and products at issue ......................................................................5

LEGAL STANDARD ...........................................................................................................6

ARGUMENT .......................................................................................................................6

I.    The Court should dismiss all of Plaintiffs' federal claims—their antitrust claims (Counts 1–5) and their new RICO claim (Count 6)—for lack of standing. ...............6

    A.    Plaintiffs are not direct purchasers under *Illinois Brick*. ...................................7

    B.    No exception to *Illinois Brick* applies. ................................................................9

        1.    The co-conspirator exception does not apply. ........................................9

        2.    There is no *Illinois Brick* exception for purchases from entities "related to a co-conspirator." ....................................................................11

    C.    Plaintiffs' injunctive-relief claims are similarly precluded by their failure to allege sufficient directness. .....................................................................12

II.    The Court should again dismiss all of Plaintiffs' antitrust claims—under federal laws (Counts 1–4) and state laws (Counts 7–10)—for failure to allege an antitrust violation. .........................................................................................................13

    A.    Plaintiffs fail to allege an actionable product hop .............................................14

        1.    Plaintiffs do not allege that Biogen coerced doctors and patients to switch from Tecfidera to Vumerity. ......................................................14

            a.    Plaintiffs' pricing and supply allegations do not show that Biogen coerced a market switch. .................................................15

            b.    Plaintiffs' new false-promotion allegations do not show that Biogen coerced a market switch. .................................................17

        2.    Plaintiffs fail to allege market foreclosure. ...........................................19

    B.    Plaintiffs fail to allege exclusive dealing. ..........................................................19

        1.    Plaintiffs' formulary-placement allegations do not show foreclosed competition. ........................................................................................20

        2.    Requests for equivalent specialty designations did not foreclose competition, and patient assistance is procompetitive. .........................24

    C.    Plaintiffs' state-law claims fall with their federal claims. .................................25

III. The Court should again dismiss the Robinson-Patman Act claim (Count 5), both because *Illinois Brick* bars it and because Plaintiffs fail to allege commercial bribery...............26

    A.    Plaintiffs' allegations still do not show that the PBMs owed them any fiduciary duty or duty of fidelity.........................................................................26

    B.    No alleged payments crossed the buyer–seller line. .......................................27

IV. The Court should dismiss Plaintiffs' new RICO claim (Count 6), both because *Illinois Brick* bars it and because Plaintiffs fail to allege key elements...................28

    A.    Plaintiffs' allegations do not show that Biogen and each of the PBMs shared a common purpose..........................................................................28

    B.    Plaintiffs do not plausibly allege that Biogen operated or managed the supposed enterprises. ..........................................................................30

CONCLUSION................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

C‌ASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
369 F.3d 732 (3d Cir. 2004) ..................................................................................13

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019)................................................................................................7

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
15 F.4th 831 (7th Cir. 2021) ................................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................6

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015)................................................................................29

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)................................................................................................7

*Boyd v. AWB Ltd.*,
544 F. Supp. 2d 236 (S.D.N.Y. 2008)....................................................................7

*Boyle v. United States*,
556 U.S. 938 (2009)..............................................................................................28

*Braden v. City of Benton*,
2024 WL 1834567 (S.D. Ill. Apr. 26, 2024)........................................................25

*Carter v. Berger*,
777 F.2d 1173 (7th Cir. 1985) ...............................................................................7

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
474 F.3d 463 (7th Cir. 2007)................................................................................27

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019)......................................................................9

*Cole's Wexford Hotel, Inc. v. UPMC*,
127 F. Supp. 3d 387 (W.D. Pa. 2015).....................................................................9

*Collins v. Associated Pathologists, Ltd.*,
844 F.2d 473 (7th Cir. 1988)................................................................................25

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009)...........................................................................28, 29

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
472 F. Supp. 2d 385 (E.D.N.Y. 2007)..................................................................28

*Dunkin' Donuts Inc. v. N.A.S.T., Inc.,*
266 F. Supp. 2d 826 (N.D. Ill. 2003) ................................................................................27

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
821 F.3d 394 (3d Cir. 2016) ...............................................................................................13

*Freeman v. Chic. Title & Tr. Co.,*
505 F.2d 527 (7th Cir. 1974) ..............................................................................................27

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l,*
424 F.3d 363 (3d Cir. 2005) ...............................................................................................10

*Humana Inc. v. Teva Pharms. USA, Inc.,*
2025 WL 1430687 (M.D. Fla. Apr. 28, 2025) .....................................................................8

*Humana, Inc. v. Biogen, Inc.,*
2023 WL 8374584 (D. Mass. Dec. 4, 2023) .........................................................................8

*Humana, Inc. v. Biogen, Inc.,*
666 F. Supp. 3d 135 (D. Mass. 2023) ...................................................................................8

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ...............................................................................................6, 11, 26

*In re Aluminum Warehousing Antitrust Litig.,*
833 F.3d 151 (2d Cir. 2016) ...............................................................................................25

*In re Asacol Antitrust Litig.,*
233 F. Supp. 3d 247 (D. Mass. 2017) ...........................................................................15, 19

*In re Beef Indus. Antitrust Litig.,*
600 F.2d 1148 (5th Cir. 1979) ............................................................................................11

*In re Brand Name Prescription Drugs Antitrust Litig.,*
123 F.3d 599 (7th Cir. 1997) ..............................................................................................11

*In re Brand Name Prescription Drugs Antitrust Litig.,*
177 F.R.D. 414 (N.D. Ill. 1997) .........................................................................................10

*In re Copaxone Antitrust Litig.,*
2025 WL 961538 (D.N.J. Feb. 27, 2025) .....................................................................16, 24

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .....................................................................13

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
680 F. Supp. 3d 919 (N.D. Ill. 2023) ............................................................................19, 22

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*In re Deere & Co. Repair Serv. Antitrust Litig.,*
703 F. Supp. 3d 862 (N.D. Ill. 2023) ...................................................................10

*In re EpiPen Marketing, Sales Practices and Antitrust Litig.,*
44 F.4th 959 (10th Cir. 2022) ...........................................................................14

*In re Express Scripts, Inc., PBM Litig.,*
2008 WL 2952787 (E.D. Mo. July 30, 2008) ..........................................................27

*In re HIV Antitrust Litig.,*
656 F. Supp. 3d 963 (N.D. Cal. 2023) .................................................. 16, 17, 18

*In re Loc. TV Advert. Antitrust Litig.,*
2023 WL 1863046 (N.D. Ill. Feb. 9, 2023) ............................................................12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
218 F.R.D. 76 (S.D.N.Y. 2003) ..........................................................................17

*In re Revlimid & Thalomid Purchaser Antitrust Litig.,*
2024 WL 2861865 (D.N.J. June 6, 2024) ................................................................8

*In re Text Messaging Antitrust Litig.,*
782 F.3d 867 (7th Cir. 2015) ............................................................................24

*In re Vitamin C Antitrust Litig.,*
279 F.R.D. 90 (E.D.N.Y. 2012) .........................................................................12

*Kleen Prods. LLC v. Ga.-Pac. LLC,*
910 F.3d 927 (7th Cir. 2018) ............................................................................10

*Kleen Prods. LLC v. Int'l Paper,*
276 F. Supp. 3d 811 (N.D. Ill. 2017) ..................................................................14

*Last Atlantis Cap. LLC v. AGS Specialist Partners,*
819 F. Supp. 2d 708 (N.D. Ill. 2010) ..................................................................26

*Limestone Dev. Corp. v. Vill. of Lemont, Ill.,*
520 F.3d 797 (7th Cir. 2008) ..............................................................................6

*Loc. Beauty Supply, Inc. v. Lamaur Inc.,*
787 F.2d 1197 (7th Cir. 1986) ...........................................................................12

*Magnus Petroleum Co., Inc. v. Skelly Oil Co.,*
599 F.2d 196 (7th Cir. 1979) ............................................................................14

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.,*
29 F.4th 337 (7th Cir. 2022) ..............................................................................7

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020)................................................................................9, 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................24

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996)................................................................................8

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011)................................................................................17

*Minn. by Ellison v. Sanofi-Aventis U.S. LLC*,
    2020 WL 2394155 (D.N.J. Mar. 31, 2020)................................................................................8

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
    728 F. Supp. 3d 89 (D.D.C. 2024)................................................................................8

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
    2019 WL 1418129 (D.N.J. Mar. 29, 2019)................................................................................8

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)................................................................................15, 19

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)................................................................................14

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002)................................................................................9

*Phoenix Bond & Indem. Co. v. Bridge*,
    477 F.3d 928 (7th Cir. 2007)................................................................................12

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016)................................................................................17, 18

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)................................................................................30

*Seaboard Supply Co. v. Congoleum Corp.*,
    770 F.2d 367 (3d Cir. 1985)................................................................................27

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020)................................................................................25

*Siva v. Am. Bd. of Radiology*,
    38 F.4th 569 (7th Cir. 2022)................................................................................6

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

*Stachon v. United Consumers Club, Inc.*,
   229 F.3d 673 (7th Cir. 2000) .................................................................29

*Tamburo v. Dworkin*,
   601 F.3d 693 (7th Cir. 2010) .................................................................25

*United Food & Commercial Workers Unions v. Walgreen Co.*,
   719 F.3d 849 (7th Cir. 2013) .................................................................30

*United Healthcare Servs., Inc. v. United Therapeutics Corp.*,
   2024 WL 1256266 (D. Md. Mar. 25, 2024) .........................................8

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .................................................................19

*United States v. Turkette*,
   452 U.S. 576 (1981) .................................................................................28

**FEDERAL STATUTES**

15 U.S.C. § 1 ...............................................................................13, 19, 28

15 U.S.C. § 2 .........................................................................................13

15 U.S.C. § 13 ...................................................................................26, 27

15 U.S.C. § 15 .........................................................................................7

18 U.S.C. § 1954 ...................................................................................28

42 U.S.C. § 1395w-3a ..............................................................................3

**STATE STATUTES AND REGULATIONS**

Fla. Stat. § 465.025(2) ...........................................................................23

Fla. Admin. Code Ann. r. 64B16-27.530 ...............................................23

225 Ill. Comp. Stat. Ann. 85/25 .............................................................23

740 Ill. Comp. Stat. Ann. 10/11 .............................................................25

N.Y. Educ. Law § 6816-a .......................................................................23

N.Y. Educ. Law § 6810 ...........................................................................23

N.Y. Educ. Law § 6826 ...........................................................................23

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (updated Sept. 2025)............................................................ 18, 25

*OIG Compliance Program Guidance for Pharm. Mfrs.*, 68 Fed. Reg. 23,731 (May 5, 2003)............................4

**INTRODUCTION**

This is Plaintiffs' second attempt to plead an antitrust case against Biogen. Although doubling in length, the Second Amended Complaint (ECF 99 (SAC)) suffers from the same flaws that led the Court to dismiss its predecessor (ECF 98 (Op.)). It thus confirms that Plaintiffs' claims cannot proceed.

**First**, Plaintiffs' federal claims all still face an insurmountable indirect-purchaser hurdle. *Illinois Brick*'s bright-line rule bars downstream purchasers from suing for passed-on overcharges. Plaintiffs are (at best) indirect purchasers seeking to recover for alleged manufacturer overcharges traveling through wholesalers and/or retailers on to patients and health plans. Op. 8, 23–25. Although the Court suggested that Plaintiffs might be able to assert allegations to avoid *Illinois Brick*, they failed to do so: There is no changing the fact that, given the prescription-drug supply chain, Plaintiffs are classic indirect purchasers. Nor can they invoke any exception to *Illinois Brick*—as they implicitly confirm by proposing an exception that no court has ever recognized. So Plaintiffs' federal antitrust claims—and their new RICO claim—fail for lack of standing.

**Second**, Plaintiffs' federal and state antitrust claims remain fatally flawed. They again assert product-hop and exclusive-dealing theories. As the Court held, a product hop requires plausible allegations that Biogen coerced a switch from branded Tecfidera (which remains on the market) to Vumerity. *Id.* 20–21. Plaintiffs' complaint, however, is predicated on the notion that Biogen sought to *promote* branded Tecfidera's availability—the opposite of a product hop, where a defendant makes a product *less* available to coerce a switch. They again allege that Biogen facilitated the supposed product hop through formulary agreements and specialty-drug designations governing generic Tecfidera. The Court, though, already recognized that those allegations have nothing to do with coercing anyone to switch from branded Tecfidera to Vumerity. Plaintiffs also allege new theories, including that Biogen falsely promoted Vumerity. Even in their telling, however, any false claim related to minor side effects that affected only a small subset of new patients for a few weeks—an unlikely basis for strong-arming

a switch to Vumerity. Additionally, allegations that less than 20% of the fumarate market switched from branded Tecfidera to Vumerity, and that generic Tecfidera quickly began outselling branded Tecfidera and Vumerity combined, do not come anywhere close to the necessary showing that the alleged product hop foreclosed competitors from the market.

Plaintiffs' exclusive-dealing theory of antitrust violations also runs into the Court's prior ruling. This theory requires allegations showing that Biogen substantially foreclosed competition in the relevant market. Plaintiffs' claim again centers on the idea that Biogen paid some pharmacy benefit managers (PBMs) to put branded and generic Tecfidera on the same formulary tier. The Court already recognized a key hole in that allegation: Plaintiffs admit that they *choose* their PBMs and formularies, and so could avoid problematic formularies. *Id.* 17. Indeed, the SAC confirms that most named Plaintiffs did *not* use a supposedly impaired formulary. Plaintiffs' ability to choose means competition was not foreclosed—let alone *substantially* foreclosed. Plaintiffs also add new exclusive-dealing theories, including that Biogen acted unlawfully by offering coupons that *reduced* patients' payments for its branded products. These pro-competitive price concessions have no bearing on market exclusion. Additionally, Plaintiffs' recognition that generic Tecfidera quickly surpassed sales of branded Tecfidera and Vumerity—combined—reinforces that they cannot show substantial foreclosure.

**Finally**, that leaves Plaintiffs' Robinson-Patman Act (RPA) claim and new RICO claim. Each is barred by *Illinois Brick*, as noted above. Each also fails for additional reasons. As for the RPA claim, Plaintiffs still have not plausibly alleged that PBMs owed them a fiduciary duty. They also fail to allege buyer–seller relationships between Biogen and the PBMs. The new RICO claim fares no better, as Plaintiffs' allegations do not show that Biogen and the PBMs against which it negotiates shared a common purpose; and that Biogen, through routine rebate negotiations, managed the affairs of illicit RICO enterprises (as opposed to conducting its own business).

The SAC should be dismissed—this time with prejudice.

The Court's dismissal order suggested that Plaintiffs might be able to avoid the indirect-purchaser bar by reframing their allegations as targeting a "scheme … predicated on Biogen and PBMs agreeing to manipulate formularies." Op. 24. The Court recognized, however, that "this theory of the case [was] contradicted by Plaintiffs' allegation" that "[w]holesalers and retailers passed on the inflated prices of fumarate drugs to Plaintiffs and Class members." *Id.* (quoting Consol. Am. Compl. ¶ 296 (ECF 27) (CAC)). The Court thus invited Plaintiffs to "contextualize" their overcharge allegation. *Id.*

Plaintiffs have not done so, and they still make that exact allegation. SAC ¶ 474. For good reason: No matter what context Plaintiffs provide, all of their claims arise from allegedly inflated prices passed on to them by other actors in the healthcare system. A recap of pharmaceutical pricing and the prescription-drug supply chain shows why. *See also* Ex. A (depicting supply and payment chains).

## A. Industry background

**PBMs.** PBMs administer drug coverage for patients enrolled in health-insurance plans. SAC ¶ 141. They compete for health-plan clients based largely on the cost savings they deliver. *Id.* ¶ 166. One tool PBMs use to keep costs low is the formulary: a list of prescription drugs, separated into tiers, "for which the health plan will reimburse pharmacies on behalf of the plan's members." *Id.* ¶¶ 142–43. A drug's tier determines the co-pay or co-insurance that members must pay for that drug, but not the pharmacy's price for the drug (which is set by the pharmacy). *Id.*

In deciding whether (and where) to place a drug on a formulary, PBMs often negotiate discounts—in the form of rebates—from manufacturers. *Id.* ¶¶ 185–86. In exchange for a rebate, a PBM may include a manufacturer's drug on a formulary or place it on a tier that reduces covered patients' co-pay or co-insurance. *Id.* ¶¶ 147–50, 185–86, 234. These rebate negotiations are standard industry practice, and their contours are prescribed by federal law. *See, e.g.*, 42 U.S.C. § 1395w-

---

[1]     Solely for purposes of this motion, Biogen treats Plaintiffs' non-conclusory allegations as true.

3a(d)(5)(A); *OIG Compliance Program Guidance for Pharm. Mfrs.*, 68 Fed. Reg. 23,731 (May 5, 2003). PBMs tell their clients that rebates reduce the plans' costs (*e.g.*, SAC ¶¶ 158(f), 159(g)), and they advertise that negotiations create value for both plans and their insureds (*e.g.*, *id.* ¶¶ 158(e), 159(o), 160(a)).

Health plans like Plaintiffs choose the PBM that administers their prescription-drug benefits. *Id.* ¶¶ 165–66. They also specifically "choose which pharmacy networks and drug formularies to use among the PBM's offerings based on health plan designs." *Id.* ¶ 192. In making those choices, plans negotiate with PBMs over "formulary management," including topics like "the formularies' approach to generic drugs," "discounts for all generic drugs off of price benchmarks," and "how many tiers are included" on a formulary. *Id.* ¶¶ 164–67 (emphasis omitted).

**The Supply Chain.** PBMs do not buy or sell anything in the pharmaceutical supply chain. That chain starts with manufacturers, which sell prescription drugs to third parties like wholesalers and distributors. *Id.* ¶¶ 114–18, 411, 413. Those entities then resell the drugs to pharmacies—whether regular pharmacies or "specialty" pharmacies (a designation associated with drugs requiring "special handling" or carrying a "high cost"). *Id.* ¶¶ 179–80, 474. Pharmacies, in turn, resell the drugs to patients. *Id.* ¶¶ 124, 181. Uninsured patients pay the medication's full "retail" price, which varies by pharmacy. *Id.* ¶¶ 150, 240, 251. Insured patients, by contrast, pay the pharmacy a co-pay or co-insurance, depending on their coverage and the applicable formulary. *Id.* ¶¶ 142, 148–50, 234.

Although the formulary determines the price that insured *patients* pay, it does not affect the total price that a pharmacy charges for a drug, the balance of which will be "reimburse[d]" by *the plan*. *Id.* ¶¶ 142–43. As Plaintiffs have admitted, "[t]he price that the plans pay is not affected by where the drug is placed on the formulary." MTD Hearing Tr. 36; *see also* Op. 15 n.3 (noting Plaintiffs' agreement that "pharmacies set their own pricing").

Later, the manufacturer pays the PBM any agreed-upon rebates or fees associated with the patient's purchase. *Id.* ¶¶ 7, 185. The PBM may pass those payments (in whole or in part) on to the

relevant plan, pursuant to the PBM's contract with that plan. *Id.*

B.    **The parties and products at issue**

**Biogen's products.** The SAC focuses on two Biogen drugs that treat patients with multiple sclerosis, a chronic autoimmune disease. The FDA approved Tecfidera in 2013. Tecfidera's active ingredient (dimethyl fumarate) slows disease progression. *Id.* ¶ 217. The FDA then approved Vumerity in October 2019. *Id.* ¶ 309–10. Vumerity's different active ingredient (diroximel fumarate) shows similar clinical benefits, but with a different side-effect profile. *Id.* ¶¶ 311, 337. The first Tecfidera generic launched in August 2020; several others followed close behind. *Id.* ¶ 410. Vumerity has no generic substitute. Biogen still sells both Tecfidera and Vumerity. E.g., *id.* ¶¶ 420–21, 434–35.

**The Plaintiff health plans.** Plaintiffs are seven health plans that provide pharmacy benefits to their members. *Id.* ¶¶ 28–45. In that role, they cover a portion of their members' prescription-medication costs. *Id.* ¶¶ 28, 31, 34, 37, 40, 43. Each Plaintiff has chosen to contract with specific PBMs and selected specific PBM formularies for their plans. *Id.* ¶¶ 30, 33, 36, 39, 42, 45. Different Plaintiffs also claim to have been affected by different subsets of the alleged conduct here. For instance, while one of Plaintiffs' central claims is that Biogen offered rebates to PBMs in exchange for placing branded Tecfidera on the same formulary tier as generic Tecfidera (*id.* ¶ 231), four out of seven named Plaintiffs do *not* claim to have chosen a formulary reflecting such an agreement. *Compare id.* ¶¶ 30, 39, 45 (making this allegation as to three Plaintiffs), *with id.* ¶¶ 33, 36, 42 (no such allegation as to the other four). As the Court recognized, "only plans using a formulary … containing the complained-of tiering problems would be injured by the alleged anticompetitive scheme." Op. 24–25.[2]

There is, however, one commonality across Plaintiffs: They all claim to have been harmed by "artificially inflated" prices they paid to pharmacies (which paid allegedly "inflated" prices to others) for branded Tecfidera, Vumerity, and generic Tecfidera. *E.g.*, Compl. ¶¶ 23, 432–35, 439, 469–76, 485.

---

[2]    Exhibit B shows which Plaintiffs claim to have been affected by which alleged conduct.

Alleging an "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Op. 8 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Close scrutiny of antitrust claims on a motion to dismiss is "particularly important," given the "enormous expense of [antitrust] discovery." *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 575 (7th Cir. 2022) (cleaned up). Similarly, "RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008).

## ARGUMENT

**I.    The Court should dismiss all of Plaintiffs' federal claims—their antitrust claims (Counts 1–5) and their new RICO claim (Count 6)—for lack of standing.**

The Court recognized that Plaintiffs' originally pleaded federal claims would need "a path that avoids" the indirect-purchaser rule laid out in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Op. 24. After all, their allegations show that they are (at best) indirect purchasers seeking redress for inflated prices "passed on" by "[w]holesalers and retailers" (*id.* (quoting CAC ¶ 296)), which would have been charged by Biogen in transactions upstream from any entity that Plaintiffs reimbursed (Op. 8, 23–24).[3]

Plaintiffs have not avoided *Illinois Brick*. They *concede* that they did not buy any drugs directly from Biogen. SAC ¶¶ 109, 114. They also *admit* that they lack standing under federal law for purchases for which wholesalers were intermediaries in the supply chain. *See id.* ¶¶ 114–16 (seeking to recover for such purchases only "under state laws that permit such claims by indirect purchasers").

Nevertheless, Plaintiffs attempt to bring federal claims based on alleged purchases from "co-conspiring" specialty pharmacies, which they claim bought those drugs directly from Biogen. *Id.* ¶¶ 110, 113. Such purchases, however, remain indirect. This forecloses Plaintiffs' Sherman Act and RPA claims for damages, as the private right of action under both laws is supplied by the statute at

---

[3]    Plaintiffs are not truly purchasers at all—they merely *reimburse* insureds' purchases. *E.g.*, SAC ¶ 28.

issue in *Illinois Brick*, 15 U.S.C. § 15(a). *See, e.g., Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 340, 342 n.3 (7th Cir. 2022) (dismissing Sherman Act claims under *Illinois Brick*); *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 249–51 (S.D.N.Y. 2008) (same for RPA claim). The Seventh Circuit has held that *Illinois Brick* "applies to RICO, too." *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985). For the same reasons, Plaintiffs do not show the requisite directness for their claims for injunctive relief. Their federal claims are thus entirely barred.[4]

### A.  Plaintiffs are not direct purchasers under *Illinois Brick*.

In *Illinois Brick*, the Supreme Court "drew a bright line that allowed *direct* purchasers"—those for whom "there is no intermediary between the purchaser and the antitrust violator"—"to sue[,] but barred *indirect* purchasers from suing." *Apple Inc. v. Pepper*, 587 U.S. 273, 282 (2019) (emphases added); *see also* Op. 23. This bright-line rule prevents "the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction." Op. 23 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474–75 (1982)).

Plaintiffs concede that they do not buy drugs directly from Biogen. They claim to have bought drugs only *indirectly*, through two channels: "from pharmacies that first procured the products through wholesalers" (for which they seek redress under state law) and from specialty pharmacies that supposedly bought "some" Tecfidera and Vumerity directly from Biogen (for which they seek redress under federal law). SAC ¶¶ 110, 113–14, 116. In both channels, there are "intermediar[ies] between [Plaintiffs] and the [alleged] antitrust violator [Biogen]," creating the potential for duplicative recovery by companies along the supply chain. *Apple*, 587 U.S. at 282; Ex. A. Indeed, two pharmacies have sued Biogen for "materially similar alleged conduct"—both in their own right as indirect purchasers (having bought from wholesalers that bought from Biogen) and as purported assignees of the wholesalers' alleged direct-purchaser claims. Pls.' Notice of Related Case ¶ 5 (ECF 105); Compl. ¶¶ 20–21, *Walgreen*

---

[4]  Exhibit C maps each of Biogen's arguments for dismissal to Plaintiffs' causes of action.

*Co. v. Biogen, Inc.*, No. 1:25-cv-11680 (N.D. Ill. Sept. 26, 2025) (ECF 1).

This is thus a case about indirect purchases, at best. The Court thought Plaintiffs might nevertheless "avoid[]" *Illinois Brick* if they alleged a scheme "predicated on Biogen and PBMs agreeing to manipulate formularies," such that Plaintiffs would be "the most directly injured victims." Op. 24. Plaintiffs, however, have not reframed their allegations. Nor would doing so solve the problem: Federal law does not confer standing based on the degree of harm a party claims to have suffered. What matters is *who the plaintiff bought from*—not whether the plaintiff was supposedly a "'direct target' of an antitrust conspiracy." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 850 (3d Cir. 1996).

Plaintiffs thus cannot plead around their indirect-purchaser status. That is unsurprising: Court after court has held that *Illinois Brick* forecloses claims by payors against drug manufacturers in connection with pharmaceutical sales. *E.g.*, *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 147 (D. Mass. 2023), *aff'd on other grounds,* 126 F.4th 94 (1st Cir. 2025); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *32 (D.N.J. June 6, 2024); *United Healthcare Servs., Inc. v. United Therapeutics Corp.*, 2024 WL 1256266, at *11 (D. Md. Mar. 25, 2024). Courts have so held in cases where payors claimed to have bought drugs directly from specialty pharmacies that supposedly conspired with the manufacturer. *E.g.*, *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 107 (D.D.C. 2024); *Humana Inc. v. Teva Pharms. USA, Inc.*, 2025 WL 1430687, at *5 (M.D. Fla. Apr. 28, 2025). Courts have also so held in cases where the payors' claims centered on allegations that the manufacturer worked with PBMs to manipulate a drug's formulary placement. *E.g.*, *Minn. by Ellison v. Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *3, *11 (D.N.J. Mar. 31, 2020); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *5, *16 (D.N.J. Mar. 29, 2019). The same result should apply here, as Plaintiffs cannot change the fact that they are indirect purchasers. *Cf. Humana, Inc. v. Biogen, Inc.*, 2023 WL 8374584, at *2 (D. Mass. Dec. 4, 2023) (denying leave to amend to "allege a direct-purchaser relationship between Humana and Biogen," on futility grounds).

**B.      No exception to *Illinois Brick* applies.**

Plaintiffs nonetheless contend that they can bring federal claims for purchases of Tecfidera and Vumerity that they claim to have made "directly" from so-called "co-conspiring specialty pharmacies" that, they further claim, purchased "some" amount of those products directly from Biogen. SAC ¶¶ 109–13.[5] As an initial matter, no conspiracy exception could salvage Plaintiffs' federal claims predicated on *unilateral* conduct by Biogen (Counts 3 and 4). Those claims are barred. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 748 (N.D. Ill. 2019) ("The 'crucial question' for courts assessing this exception is whether the alleged anticompetitive conduct *stems from* an agreement between the alleged co-conspirators." (emphasis added)); *Cole's Wexford Hotel, Inc. v. UPMC*, 127 F. Supp. 3d 387, 420 (W.D. Pa. 2015) (holding that "the co-conspirator exception does not apply to" claims "based upon [defendant's] unilateral conduct"). As to Plaintiffs' other federal claims, their allegations do not properly invoke the co-conspirator exception—or any other—to *Illinois Brick*.

**1.      The co-conspirator exception does not apply.**

The co-conspirator exception "allocate[s] to *the first non-conspirator in the distribution chain* the right to collect 100% of the damages." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002) (emphasis added). It would allow an indirect purchaser that bought from Company A (a direct purchaser) to sue Company B (the manufacturer that sold to A) if both A and B allegedly participated in the conspiracy. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). In such circumstances, the co-conspirators (A and B) are both "considered to be the relevant seller." *Id.* This exception does not apply here, for two independent reasons.

**First**, Plaintiffs' allegations concern a purported conspiracy between Biogen and their PBMs—not specialty pharmacies. Indeed, the Court held that Plaintiffs' prior allegations did "not

---

[5]     Plaintiffs' sole basis for this assertion is a statement by Biogen about "distribut[ion]" channels for unnamed products (*id.* ¶ 111)—which does not state that Biogen *sells* Tecfidera or Vumerity directly to any pharmacies. Discovery would show that there are no such direct sales. Solely for purposes of this motion, however, Biogen assumes the truth of Plaintiffs' allegations.

support an inference that [the specialty pharmacies'] inflated pricing is attributable to any agreement between Biogen and the PBMs," and stressed that it would take "significantly more" to suggest that those prices were attributable to conduct by *Biogen.* Op 15 n.3. Plaintiffs offer nothing more. Though the SAC repeatedly mentions specialty pharmacies, it alleges *nothing* about their role in the supposed conspiracy. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834–35 (7th Cir. 2021) ("[A]ll we see are conclusory allegations [of conspiracy]. Repetition cannot substitute for factual allegations."). Plaintiffs merely assert that those pharmacies "charged inflated prices" (SAC ¶ 474)—which could be true whether they were knowing conspirators or innocent intermediaries. Even if those conclusory price-inflation allegations could be credited, inflated prices alone do not show a conspiracy. *See, e.g., Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 937 (7th Cir. 2018) (recognizing that "price increases" are "just as consistent with independent action as with collusion").

The Court's observation thus holds true: Plaintiffs fail to offer any "plausible non-conclusory allegation that the specialty pharmacies were aware of, or joined, any conspiracy." Op. 15 n.3; *see also Marion*, 952 F.3d at 841 ("A plaintiff is not entitled to resort to frivolous accusations of conspiracy to evade the *Illinois Brick* rule; the allegation must still reach the level of baseline plausibility.").

**Second**, even if Plaintiffs *had* plausibly alleged a conspiracy involving specialty pharmacies, they still cannot invoke the co-conspirator exception because they have not joined those entities as defendants. The exception requires doing so. *See, e.g., Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l*, 424 F.3d 363, 376–81 (3d Cir. 2005); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 877, 887–88 & n.18 (N.D. Ill. 2023) (collecting decisions holding that "the rationales underpinning *Illinois Brick*" require naming alleged co-conspirators in pass-through overcharge cases, but reserving the question); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. 414, 418 (N.D. Ill. 1997) (interpreting "Seventh Circuit [to] adhere[] to the legal position that, to qualify for the co-conspirator exception to *Illinois Brick*, intermediaries in an alleged vertical conspiracy must be formally joined").

This rule makes perfect sense. For an *Illinois Brick* exception to work, there must not be "the slightest possibility of duplicative exaction." Op. 23 (citation omitted). Indeed, a concern about "[t]he risk of duplicative recoveries" animated *Illinois Brick* itself. 431 U.S. at 730. That exact possibility would arise if Plaintiffs could invoke the co-conspirator exception *without* suing the supposed co-conspirators: If Plaintiffs somehow proved that Biogen monopolized the fumarate market by conspiring with specialty pharmacies, that judgment would be preclusive on the pharmacies *only* if they were also defendants—otherwise, they could sue Biogen for the same overcharges. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979) ("[T]he possibility of inconsistent adjudications on … the existence of a vertical conspiracy leaves the defendants subject to the risk of multiple liability.").

### 2. There is no *Illinois Brick* exception for purchases from entities "related to a co-conspirator."

Unable to allege that *specialty pharmacies* act as co-conspirators, Plaintiffs try anchoring their argument to the fact that some of those pharmacies are supposedly "owned or controlled" by *PBMs* that, Plaintiffs say, conspired with Biogen. SAC ¶ 258. As they did last time, Plaintiffs appear to urge the Court to recognize a new *Illinois Brick* exception—one for purchases from an entity (a specialty pharmacy) related to an alleged co-conspirator (a PBM). The Court should decline this invitation.

Plaintiffs' argument draws from the "owned or controlled" exception, which permits indirect purchasers to sue where they bought from Company A (a direct purchaser) that was in turn "owned or controlled by" Company B (the manufacturer that sold to A). *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (citation omitted). That exception, however, has no application here, as Plaintiffs do not allege that *Biogen* owns or controls the pharmacies. That alone forecloses their argument.

Plaintiffs seemingly try to avoid this conclusion by layering the "owned or controlled" exception atop the co-conspirator exception. But no court has recognized such a layered exception. *See id.* at 605 ("[T]he only exceptions to the *Illinois Brick* doctrine are those stated in *Illinois Brick*

itself ….”); *In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 1863046, at *2 (N.D. Ill. Feb. 9, 2023) (declining to extend the owned-or-controlled exception). Given that Plaintiffs have not joined the supposed co-conspirator PBMs as defendants, this case is a particularly bad vehicle for conjuring up a new *Illinois Brick* exception. *Supra* 10–11.

Even if it could somehow matter for the PBMs (rather than Biogen) to own or control the specialty pharmacies, Plaintiffs do not actually allege that to be the case. While they add many new paragraphs on the corporate structures to which specific PBMs and specialty pharmacies belong (SAC ¶¶ 48–107), they never claim that any PBM *owns* any specialty pharmacy from which Plaintiffs claim to have purchased any fumarate drugs. Nor does merely alleging that the PBMs and specialty pharmacies are corporate cousins establish the requisite *control* for the “owned or controlled” exception. *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012) (“Crucially, this exception is available only if the plaintiff shows that the defendant has such control over the subsidiary that the defendant can be said to have ‘set prices along the chain of distribution.’” (citation omitted)); *Loc. TV*, 2023 WL 1863046, at *2 (requiring the two entities to be “essentially the same”).

There is no basis for treating Plaintiffs’ purchases from specialty pharmacies—which neither conspired with, nor were owned or controlled by, Biogen—as akin to purchases directly from Biogen.

**C.    Plaintiffs’ injunctive-relief claims are similarly precluded by their failure to allege sufficient directness.**

Lack of a direct purchase similarly bars Plaintiffs’ Sherman Act and RPA injunctive-relief claims under §16 of the Clayton Act. “A plaintiff seeking equitable relief under § 16 … should be no less representative of the interests of the antitrust ‘victims’ than those seeking damages under § 4.” *Loc. Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1204 (7th Cir. 1986). So too for the RICO claim. *See, e.g.*, *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007), *aff'd*, 553 U.S. 639 (2008) (RICO’s proximate cause requirement asks whether “someone else [is] a distinctly better enforcer” and looks to “the presence of intermediate parties”). Although the Court thought Plaintiffs might be

able to frame themselves as "the most directly injured victims" (Op. 24), Plaintiffs cannot plead around the fact that intermediaries nearer to Biogen in the supply chain can—and indeed now have—filed their own claims based on the same alleged conduct. Because Plaintiffs are indirect purchasers seeking remedy for passed-on overcharges, there are "far more direct victims" of the alleged scheme. *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 741–42 (3d Cir. 2004); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013) (directness "focuses on the presence of more immediate victims … presumed to be in a better position to" sue).

## II. The Court should again dismiss all of Plaintiffs' antitrust claims—under federal laws (Counts 1–4) and state laws (Counts 7–10)—for failure to allege an antitrust violation.

Plaintiffs build their federal antitrust claims under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as well as their state-law antitrust claims, on the same chassis as last time: a product-hop theory centered on Biogen's alleged efforts to switch patients from branded Tecfidera to Vumerity (*e.g.*, SAC ¶¶ 308–83), and an exclusive-dealing theory centered on Biogen's rebate agreements with PBMs (*e.g.*, *id.* ¶¶ 224–303). Although the Court rejected both of those theories (Op. 11–22), Plaintiffs have doubled down: They add standalone product-hop monopolization claims (Counts 3 and 8), and allege new supposed misconduct in an attempt to cure the deficiencies that the Court identified.

Plaintiffs' effort to amalgamate different types of alleged wrongdoing fails. They baldly assert that the "various tactics" collectively affected 75 to 90% of insureds. SAC ¶ 302. Yet they offer few specifics as to the number of insureds affected by *each* form of challenged conduct, and so do not allege facts sufficient to rule out that—as with their prior allegations—"the majority of U.S. patients (and their sponsoring plans) … avoided the allegedly problematic" conduct. Op. 18. In fact, Plaintiffs confirm that most plans *did* avoid the conduct they challenge. *Infra* 15, 20–22; *see also* Ex. B. That alone is fatal: Plaintiffs' ability to choose prevents them from establishing that Biogen's conduct foreclosed competition. *See, e.g.*, *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) ("[I]f customers are free to switch to a different product in the marketplace but choose not to do so,

competition has not been thwarted …."); *Magnus Petroleum Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196, 201 (7th Cir. 1979) (challenged agreements "did not substantially foreclose competition because in the key years plaintiffs bought large quantities of gasoline from other suppliers").

Even setting aside the problem of choice, Plaintiffs cannot simply rely on their conclusory top-line number as to the supposed impact of Biogen's conduct. When, as here, alleged anticompetitive conduct "does not fit within a single paradigm, … courts disaggregate the exclusionary conduct into its component parts before applying the relevant law." *In re EpiPen Marketing, Sales Practices and Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (discussing *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449–52, 457 (2009)). Just as last time, Plaintiffs do not plausibly allege that any of that conduct is anticompetitive. This thus remains a case where "[z]ero plus zero equals zero." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 844 (N.D. Ill. 2017) (citation omitted), *aff'd* 910 F.3d 927 (7th Cir. 2018). Plaintiffs have simply added more zeroes.

### A.    Plaintiffs fail to allege an actionable product hop.

The Court dismissed Plaintiffs' product-hop theory because they did "not plausibly allege[] that Biogen's introduction of Vumerity was paired with coercive conduct." Op. 22. Their theory still fails for that reason, and because they do not allege foreclosure. Plaintiffs' new standalone product-hop claims (Counts 3 and 8) should thus be dismissed, and they should not be permitted to rely on that theory for their other antitrust claims (Counts 1–2, 4, 7, 9–10).

#### 1.    Plaintiffs do not allege that Biogen coerced doctors and patients to switch from Tecfidera to Vumerity.

"[T]he element of coercion is vital" to a product-hop claim, as a means of "distinguishing conduct that preserves and expands consumer choice from conduct that prevents competition on the merits." Op. 21. Accordingly, Plaintiffs must "point to some alleged conduct by Biogen and its co-conspirators that *forced* patients and doctors to switch" from branded Tecfidera to Vumerity "for reasons other than the merits." *Id.* (emphasis added). Plaintiffs did not adequately allege coercion

before (*id.* 21–22), and do not do so now.

> **a.** **Plaintiffs' pricing and supply allegations do not show that Biogen coerced a market switch.**

For their product-hop theory, Plaintiffs rely on a rehash of their prior—and insufficient—allegations regarding formulary agreements and specialty-drug designations for generic Tecfidera. They also add new allegations involving coupons to reduce the price of Vumerity for patients, rebate agreements that linked branded Tecfidera and Vumerity, and a supposed attempt at reducing one manufacturer's supply of generic Tecfidera.

A fundamental flaw with these allegations—and thus with Plaintiffs' product-hop theory—is that they concern Biogen's efforts to promote Tecfidera's availability. Product-hop cases, however, concern the exact opposite scenario: a manufacturer that makes a drug *less* available, to coerce a switch to some new drug. *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) ("*Namenda*") (defendant "effectively withdr[ew] [first drug]"); *In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 267–68 (D. Mass. 2017) (explaining significance of product withdrawal in product-hop cases). For that reason and others, the allegations underlying Plaintiffs' product-hop theory all fail.

**Formulary agreements and specialty designations.** Plaintiffs repeat their allegation that Biogen negotiated to have generic Tecfidera on the same formulary tier as Vumerity. *E.g.*, SAC ¶ 306. The Court, however, already recognized that "making generic dimethyl fumarate more expensive to patients" would not "coerce doctors and patients to switch to Vumerity"—particularly given Plaintiffs' allegation that "physicians do not choose what therapies to prescribe based on cost." Op. 21 (citing CAC ¶¶ 52–53); *see also* SAC ¶¶ 124–25 (restating those allegations). Indeed, Plaintiffs say that Biogen was similarly negotiating to keep *branded* Tecfidera on the same tier as generic Tecfidera—and thus the same tier as Vumerity. *E.g.*, *id.* ¶ 231. Parity between branded Tecfidera and Vumerity would not coerce anyone to switch from the former to the latter. So this theory—which, in any event, implicates fewer than half of the named Plaintiffs (SAC ¶¶ 30, 33, 39; Ex. B)—still does not work.

The same is true for Plaintiffs' renewed allegation that Biogen somehow negotiated to have generic Tecfidera designated as a specialty drug: "[T]he Court does not see how this would coerce patients on Tecfidera regimens to switch to Vumerity, which was also a specialty drug." Op. 22. Plaintiffs have not bridged that logical disconnect.

**Patient coupons and linked rebates.** Plaintiffs newly claim that the market-switch effort involved (1) coupons that Biogen issued to reduce patients' payments for Vumerity, and (2) rebates that linked Tecfidera sales to Vumerity's formulary placement. SAC ¶¶ 394–98. Plaintiffs never claim that it is unlawful to issue patient-assistance coupons to commercially insured patients—nor could they. *See, e.g.*, *In re Copaxone Antitrust Litig.*, 2025 WL 961538, at *25 (D.N.J. Feb. 27, 2025) (explaining, in the context of antitrust allegations over patient-assistance coupons, that "[l]owering a patient's out-of-pocket costs, thereby making a product more attractive to a consumer, standing alone, does not make the conduct anticompetitive").[6] Regardless, Plaintiffs are unable to explain how offering patient-assistance coupons for *both* Tecfidera (SAC ¶ 288) *and* Vumerity (*id.* ¶ 385) would coerce a patient to switch from one product to the other.

Plaintiffs' linked-rebate allegations fare no better. No named Plaintiff claims to have had a formulary that linked rebates for Tecfidera and Vumerity, and so none has standing as to that claimed injury. *Id.* ¶¶ 28–45; Ex. B; Op. 24–25. Moreover, Plaintiffs do not allege that Vumerity received *better* tier placement than Tecfidera, and so cannot claim that this conduct coerced a switch to Vumerity. SAC ¶ 397. In any event, Plaintiffs' allegations *refute* the idea that linked rebates—or patient coupons—would affect doctors' prescriptions, as "doctors typically are not aware of [drugs'] relative costs." *Id.* ¶ 125; *cf. In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 977–78 (N.D. Cal. 2023) ("no reasonable jury could find coercion" based on a "pricing differential" caused by "formulary coverage decisions").

---

[6]    Plaintiffs refer in passing to legal restrictions on patient-assistance coupons for Medicare recipients and residents of two states (SAC ¶ 297), but do not allege that Biogen violated such restrictions.

**Agreement with generic manufacturer.** Plaintiffs also newly claim—parroting allegations from another lawsuit—that Biogen terminated a contract that had allowed one company to sell an "authorized generic" version of Tecfidera. *Id.* ¶¶ 399–404, 405 n.5. These borrowed allegations, resting on unproven assertions from another case, are not well-pleaded facts. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("[R]eferences to preliminary steps in litigations … that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) …."). Even if those allegations *could* be credited, Plaintiffs nowhere allege that Biogen made *branded* Tecfidera less available than Vumerity.

> **b.    Plaintiffs' new false-promotion allegations do not show that Biogen coerced a market switch.**

Plaintiffs did not previously allege a false-promotion theory. Now, however, they spend over 50 paragraphs alleging a "pervasive marketing campaign," supposedly centered on the "false assertion that Vumerity had better GI [gastrointestinal] tolerability than" Tecfidera. SAC ¶ 361; *id.* ¶¶ 330–83.

In fact, the key study underlying these new allegations *does* show a greater number of adverse GI event days for patients on Tecfidera than Vumerity (a difference identified with 95% confidence). Biogen, *EVOLVE-MS-2 Results*, https://tinyurl.com/ycx4sds5.[7] But the Court need not credit those study results to find that Plaintiffs' new false-promotion allegations fall far short of showing coercion.

"[A]bsent an accompanying coercive enforcement mechanism of some kind, even demonstrably false '[c]ommercial speech is not actionable under the antitrust laws.'" *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011) (citation omitted). Thus, "[t]he critical question" in a product-hop case predicated on false marketing is whether those falsehoods are "coerci[ve]"—that is, falsehoods that would effectively eliminate patient choice and force a switch from one product to the other. *HIV*, 656 F. Supp. at 978; *see also, e.g., Retractable Techs., Inc. v. Becton*

---

[7]    The Court can consider this study, which is incorporated into the complaint. SAC ¶ 342.

*Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) ("[A]bsent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie."); Areeda & Hovenkamp, *Antitrust Law* ¶ 782b (updated Sept. 2025) (false-advertising antitrust claim requires a "clearly material" misrepresentation). If *any* supposed falsehood were sufficient, every false-marketing case could be turned into an antitrust dispute. *See Retractable Techs.*, 842 F.3d at 895 (explaining why "false advertising alone hardly ever operates in practice to threaten competition"). For two reasons, Plaintiffs' allegations fall far short of showing coercion.

**First**, based on Plaintiffs' telling, the alleged falsehoods were essentially irrelevant for all patients who were already taking Tecfidera—that is, the vast majority of individuals who could be *switched* from Tecfidera to Vumerity. They say clinical studies established that "any GI side effects from Tecfidera typically arose only for first-time Tecfidera patients and only during the first month of treatment." SAC ¶ 344. So claims about GI side effects would not matter to most patients already taking the drug—never mind *coerce* them into switching to a new drug. That is all the more true given Plaintiffs' allegations of other "significant" reasons that patients would prefer *Tecfidera. Id.* ¶ 337.

**Second**, even as to *new* patients for whom a reduction in early GI side effects could be relevant, Plaintiffs allege that this benefit would have provided an unlikely basis for coercing a switch to Vumerity. *See HIV*, 656 F. Supp. 3d at 978 (holding that no reasonable jury could find coercion based on allegedly overstated safety concerns). They say that only 4% of patients stopped using Tecfidera due to GI side effects, and that only 1% of patients on Tecfidera faced "serious GI events" ("none of which were fatal"). SAC ¶ 344 (citation omitted). Plaintiffs also allege that Tecfidera's GI side effects are readily manageable, including by "taking Tecfidera with food … or with aspirin." *Id.*; *see also id.* ¶ 349 (stating that "[t]he number of event days [with GI symptoms] are very small" for Tecfidera). It is implausible that easily managed side effects, affecting a small minority of patients for only a short time, could have *coerced* doctors and patients into switching to a new drug.

### 2. Plaintiffs fail to allege market foreclosure.

Even if Plaintiffs had adequately alleged coercion, they must also show foreclosure—*i.e.*, that the product hop "bar[red] a substantial number of rivals or severely restrict[ed] the market's ambit." *Asacol*, 233 F. Supp. 3d at 256, 270 n.6 (citation omitted). The Court did not reach this argument before, but Plaintiffs fail on this front, too. Their allegations indicate that Biogen switched less than 20% of the market from Tecfidera to Vumerity. *See* SAC ¶¶ 414, 416 (alleging that Vumerity accounted for 29% of branded sales, and that branded sales were roughly 2/3 of the market). Branded Tecfidera always outpaced Vumerity (*id.* ¶¶ 414, 416), and generic Tecfidera overtook *both* branded products combined in mid-2022 (*id.* p.126). That does not show that the supposed product hop foreclosed generic Tecfidera from the market. Indeed, in the *Namenda* product-hop case, the Second Circuit relied on precedent holding that plaintiffs must prove foreclosure of 40% to 50% of the market for a claim under § 1 of the Sherman Act, and roughly the same for a § 2 claim. 787 F.3d at 655–56 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc)). Plaintiffs here come nowhere close.

Plaintiffs' standalone product-hop claims (Counts 3 and 8) should thus be dismissed, and they should not be permitted to rely on that theory for their other antitrust claims (Counts 1–2, 4, 7, 9–10).

### B. Plaintiffs fail to allege exclusive dealing.

Plaintiffs' renewed exclusive-dealing theory also fails. To state an exclusive-dealing claim, a plaintiff must show that the conduct "forecloses competition in a substantial share of the line of commerce at issue, resulting in at least one significant competitor of the defendant who is excluded from doing business in a relevant market." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 979 (N.D. Ill. 2023) (cleaned up). Plaintiffs' theory again centers on allegations that Biogen paid PBMs rebates and fees to ensure that the PBMs did not disadvantage branded Tecfidera relative to generic Tecfidera, and subjected generic Tecfidera to the same specialty designation as branded Tecfidera. The Court, though, already found these allegations insufficient. Op. 14–15 & n.3. So Plaintiffs add new allegations, claiming that Biogen negotiated for generic Tecfidera to be subject to well-established

utilization-management tools, and issued coupons that *eliminated* patients' out-of-pocket costs for branded Tecfidera. Those additions do not change the outcome. Additionally, Plaintiffs' claim that generic competition was substantially foreclosed from the market is undercut by the fact that generic Tecfidera overtook both Tecfidera and Vumerity in mid-2022. SAC p.126. Their exclusive-dealing theory (which underlies Counts 1–2, 4, 7, 9–10) should again be dismissed.

### 1. Plaintiffs' formulary-placement allegations do not show foreclosed competition.

Plaintiffs' primary claim is again that Biogen conditioned PBM rebates on Tecfidera's receiving at least "the same" formulary placement as generic Tecfidera. *Id.* ¶ 231. In their telling, equal tiering can interfere with the operation of some states' generic-substitution laws. *Id.* ¶¶ 253–54. They also add a new theory regarding the rebate agreements—namely, that Biogen conditioned rebates and fees on the PBMs subjecting generic Tecfidera to "utilization management" tools: "step edits" that require an insured to try a different drug first, and "prior authorizations" that require a doctor to formally request the drug. SAC ¶¶ 274–77. Plaintiffs never say whether branded Tecfidera was subject to these same tools, in which case Biogen would simply have been negotiating for equal treatment. *See* Op. 15 n.3. Regardless, their rebate-agreement allegations still fail to establish substantial foreclosure.

**First**, the Court already recognized the core problem with this theory: If plans "choose which pharmacy networks and drug formularies to use," then "what stopped them" from "select[ing] formularies *lacking* any problematic tiering features … and reaping the competitive benefits of state substitution laws?" Op. 17 (emphasis added). Plaintiffs have not answered that question. Just as before, they allege that "plans may choose which pharmacy networks and drug formularies to use among the PBM's offerings based on health plan designs." SAC ¶ 192. Also, just as before, they allege that their negotiations with PBMs include "formularies' approach to generic drugs." *Id.* ¶ 165. Given that Plaintiffs chose which formularies to use, they cannot allege that competitors were foreclosed. There is still an "obstacle to the plausibility of Plaintiffs' foreclosure allegations." Op. 17.

Even Plaintiffs' attempt at sidestepping that obstacle is recycled: They again assert that "information asymmetries" prevented them from selecting another formulary. *Id.* ¶ 192. The Court already found this explanation "implausible, given that the majority of U.S. patients (and their sponsoring plans) seem to have avoided the allegedly problematic formulary schemes altogether." Op. 18. If anything, the SAC *reinforces* that problem: Plaintiffs again allege that most patients—60%—were *not* affected by this alleged conduct. SAC ¶¶ 248–49. Indeed, only three of the seven named Plaintiffs (Local 1, NYST, and JPOFFHIT) allege that they selected a formulary that placed generic and branded Tecfidera on the same tier. SAC ¶¶ 30, 39, 45; Ex. B. Even then, Local 1 admits that it also used a PBM that did *not* do so. SAC ¶ 30. No other Plaintiff claims to have used a formulary "containing the complained-of tiering;" so they were not "injured by" that conduct. Op. 24–25.

The problem is even more pronounced for Plaintiffs' allegations regarding utilization-management tools: They do not claim that a single named Plaintiff's formularies used these tools. Ex. B. Plaintiffs thus lack standing to challenge this conduct. Op. 24–25. Even if that were not the case, the fact that no named Plaintiff claims to have been subject to these utilization-management tools— which Plaintiffs concede are standard and "legitimate" tools that PBMs use to promote "price competition" (SAC ¶¶ 275, 277–78)—confirms that Plaintiffs cannot show foreclosure on this basis.[8]

Given that most Plaintiffs *avoided* the challenged conduct, their protests about "information asymmetries" once again fail "to bridge the gap from possible to plausible." Op. 17–18. Although the Court previously asked whether Plaintiffs could allege that the PBMs "had done anything to steer, force, or coerce plans to select formularies with problematic features" (*id.* 18 n.4), they did not allege such coercion before and do not allege it now. To the contrary, Plaintiffs concede that "the PBM's or

---

[8] Although Plaintiffs baldly assert that Biogen's use of these tools was "illegitimate" (*id.* ¶ 276), they offer no allegations as to how the tools—separate from any other conduct—undermined competition. *See id.* ¶¶ 279–83 (blending allegations regarding formulary placement and utilization-management tools). For that reason, too, these new allegations do not help Plaintiffs.

the formularies' approach to generic drugs *as a class*" is a proper subject of "negotiations between the health plan and the PBM" (SAC ¶ 165), and that health plans have sufficient leverage to push back on PBMs. *See id.* ¶ 186 ("[M]ore health plans required PBMs to pass a majority of the manufacturer 'rebates' through to them …."). Although Plaintiffs add allegations about why they have chosen not to negotiate individual drugs (*e.g.*, *id.* ¶¶ 166–67)—which they do not attribute to any conduct by *Biogen*—they never explain why they could not have required favorable treatment of generics as an "*aggregate* issue[]" (*id.* ¶ 165 (emphasis added)). While a subset of Plaintiffs may have regrets about their negotiations and formulary selections, their choices do not support an antitrust claim against Biogen.

**Second**, Plaintiffs again fail to show foreclosure based on generic-substitution interference. To start, the fact that health plans *choose* their formularies means Plaintiffs cannot show *any* foreclosure. *Supra* 20–22. Even if Plaintiffs could overcome the problem of choice, they have not adequately alleged *substantial* foreclosure—which, again, requires that the challenged conduct "result[ed] in at least one significant competitor" being "excluded from doing business in a relevant market." *Dealer Mgmt. Sys.*, 680 F. Supp. 3d at 979 (cleaned up). Indeed, Plaintiffs allege the *opposite* of substantial foreclosure: They concede that generic Tecfidera's entry had a "dramatic" effect on the market (Op. 6) and that generics rapidly surpassed *combined* sales of branded Tecfidera and Vumerity (SAC ¶¶ 414, 421 (figure)).

Nevertheless, Plaintiffs rely on a chart claiming that plans chose formularies in which generic Tecfidera was placed on the same tier as branded Tecfidera for 39% of insureds in 2021, 33% in 2022 and 2023, and 24% in 2024. SAC ¶ 249. That means that 61% of insureds were *not* impacted by plans' choice of such formularies even in the supposed scheme's "key year." *Id.* In later years, the percentage of unaffected patients *increased* to two-thirds and then three-fourths. *Id.* ¶¶ 242, 249.[9] All of this further

---

[9] These numbers *understate* the number of unaffected patients. Plaintiffs concede that 20% of the population lives in states with generic-substitution laws that would *not* be hindered by equivalent formulary placement. *Id.* ¶ 257. Additionally, the Court recognized that "[e]quivalent tiering in a coinsurance plan would still allow drug substitution laws to operate" (Op. 15 n.2), but Plaintiffs do not indicate how many patients in their statistics paid co-insurance as opposed to co-payments.

confirms that plans could—and by and large *did*—choose unobjectionable formularies.

The upshot: Plaintiffs' generic-substitution allegations do not show substantial foreclosure. As Plaintiffs themselves say, "[s]ales of [Tecfidera's] magnitude typically attract entry by numerous generic manufacturers, *and that happened here*." SAC ¶ 410 (emphasis added).

**Third**, Plaintiffs do not plausibly plead that the challenged conduct would have interfered with any applicable generic-substitution law. Only three Plaintiffs (Local 1, JPOFFHIT, and NYST) claim to have been affected by such interference, for reimbursements in three states: Illinois, Florida, and New York. SAC ¶¶ 29, 38, 44.[10] Plaintiffs' allegations, moreover, do not show that any of those states' generic-substitution laws operate based on a particular patient's co-pay, such that those Plaintiffs *could* be affected. None of those laws speak in terms of a patient's co-pay or out-of-pocket cost, and it is unclear that the terms they *do* use refer to the price paid by any particular individual under her plan's terms. Illinois' law operates based on the "unit price" of the "drug product"—not a consumer's cost. 225 Ill. Comp. Stat. Ann. 85/25. For Florida's law—providing for substitution of "a less expensive, generically equivalent drug product" (Fla. Stat. § 465.025(2))—regulations clarify that substitution is based on the "retail price difference between" the branded and generic drug (Fla. Admin. Code Ann. r. 64B16-27.530). The story in New York is similar: The statute provides for substitution of a "less expensive drug product" (N.Y. Educ. Law § 6816-a), and the law's broader context centers on the retail price. *See id.* § 6810(6)(a) (referencing the pharmacist's "regular price"); *id.* § 6826 (requiring pharmacies to notify customers of drug retail price list). Plaintiffs have thus failed to show that *any* of the relevant laws actually support their "obscur[ing] [] price signals" theory. SAC ¶ 231.

---

[10] JPOFFHIT, however, admits that its plan used co-insurance (*id.* ¶ 45)—so generic-substitution laws were irrelevant (Op. 15 n.2). Additionally, Local 1 used two formularies during the relevant period, one of which did *not* put branded and generic Tecfidera on the same tier. SAC ¶ 30.

### 2. Requests for equivalent specialty designations did not foreclose competition, and patient assistance is procompetitive.

Plaintiffs again try bolstering their exclusive-dealing theory with other alleged conduct: their previously rejected theory regarding specialty-drug designations, plus new allegations regarding Biogen's cost-lowering patient coupons. None of these allegations move the needle.

**Specialty-drug designations.** Plaintiffs renew their claim that Biogen negotiated for generic Tecfidera to be subject to the "same [specialty-drug] designation and set of restrictions" as branded Tecfidera, which they allege led to generic Tecfidera being distributed through specialty pharmacies that charged a higher price for it. SAC ¶ 259; *see generally id.* ¶¶ 258–72. The Court, however, already questioned how ensuring that "the generic and branded drugs were treated the same" could be "anti-competitive." Op. 15 n.3. Nothing in the SAC solves that problem. Nor does this allegation support an inference of substantial foreclosure: Plaintiffs do not allege barriers to entry in the generic market, so increased prices for generic Tecfidera should incentivize *more* manufacturers to enter—not *fewer*. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015) (without barriers to entry, "a higher price generating higher profits" will attract new entrants).

**Patient coupons.** Plaintiffs newly claim that Biogen harmed competition by issuing coupons that covered insured patients' co-payments or co-insurance for purchases of branded Tecfidera and Vumerity. SAC ¶¶ 292, 395; *supra* 16. In other words, they say it was anticompetitive for Biogen to *reduce* consumers' costs. Patient assistance, however, is fundamentally pro-competitive. *See, e.g.*, *Copaxone*, 2025 WL 961538, at *25 ("[l]owering a patient's out-of-pocket costs … does not make the conduct anticompetitive"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition."). Moreover, Plaintiffs (correctly) do not allege that Biogen only began offering these coupons upon generic Tecfidera's entry. *See Copaxone*, 2025 WL 961538 at *26 ("The allegation that the Copay Assistance 'suppressed generic competition' is further undermined by the fact that the Copay Assistance is alleged

to have occurred for nine years before there was an available generic."). Nothing in the antitrust laws requires branded manufacturers to *stop* offering patient assistance—and thus *increase* patients' prices—once a generic enters the market. While Plaintiffs complain that the coupons increased demand for Tecfidera and required them to pay more for branded Tecfidera than they would have paid for generic Tecfidera, that does not turn pro-competitive conduct into an antitrust violation.

### C.  Plaintiffs' state-law claims fall with their federal claims.

State antitrust laws generally follow federal antitrust law. *E.g.*, Areeda & Hovenkamp, *Antitrust Law* § 2400; 740 Ill. Comp. Stat. Ann. 10/11 (requiring antitrust provisions to be construed consistent with parallel federal antitrust law); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 480–81 (7th Cir. 1988) (affirming dismissal of Illinois antitrust claim "for the reasons stated regarding the parallel federal claim"). Additionally, Plaintiffs do not adequately allege their state-law claims, instead merely listing state statutes that Biogen supposedly violated. SAC ¶¶ 592(a)–(cc), 603(a)–(cc), 616(a)–(cc), 630(a)–(cc). Courts consistently reject this laundry-list approach. *See, e.g., In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of state-law antitrust claims where plaintiffs "list[ed] a couple dozen state statutes in alphabetical order by state, without pleading any of their elements"); *Braden v. City of Benton*, 2024 WL 1834567, at *6 (S.D. Ill. Apr. 26, 2024) (holding that merely "listing out [] state law claims … do[es] not meet the [federal] pleading standards").

The state-law claims should thus fall with the federal-law claims. *See, e.g., Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (affirming dismissal of Illinois antitrust claim that "simply repeats the inadequate allegations contained in the federal antitrust claim"); *Collins*, 844 F.2d at 480–81 (similar); *see also Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 919 (7th Cir. 2020) (affirming decision to decline to address state-law antitrust claims after dismissal of federal claims).[11]

---

[11]  Given space constraints, Biogen does not here assert independent, dispositive grounds that Plaintiffs' state-law claims fail. If this case were to proceed, Biogen reserves its state-law arguments.

**III. The Court should again dismiss the Robinson-Patman Act claim (Count 5), both because *Illinois Brick* bars it and because Plaintiffs fail to allege commercial bribery.**

The Court dismissed Plaintiffs' commercial-bribery claim under § 2(c) of the RPA (15 U.S.C. § 13(c)) because Plaintiffs' allegations failed to establish that PBMs owed them a fiduciary duty. Op. 28–29. They have tried but failed to solve that issue. They also still run into other problems, including that neither the PBMs nor Plaintiffs purchased anything from Biogen, as well as *Illinois Brick*. *Supra* § I.

**A. Plaintiffs' allegations still do not show that the PBMs owed them any fiduciary duty or duty of fidelity.**

Following the Court's previous analysis, the only avenue for Plaintiffs to show a fiduciary duty is based on "special circumstances." Op. 26–27. So they must plausibly allege that they shared a "special relationship of trust and confidence" with the PBMs. *Last Atlantis Cap. LLC v. AGS Specialist Partners*, 819 F. Supp. 2d 708, 718 (N.D. Ill. 2010). Plaintiffs try to do so by identifying marketing statements from which they argue a relationship of trust could be inferred.

Those statements, however, do not support the inference of a fiduciary duty. Those statements show PBMs holding themselves out as acting in the interests of two distinct constituencies: (1) the health plans with which they contract, and (2) the members of those plans. *See, e.g.*, SAC ¶ 158(e) ("Express Scripts relentlessly advocates on behalf of our clients *and their members* …."); *id.* ¶ 159(o) (CVS Caremark "bring[s] value to *consumers* and our clients"); *id.* ¶160(a) ("OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* ….") (all emphases added). Plaintiffs, however, offer no well-pleaded allegations indicating that such dual-alignment statements— addressing constituencies with divergent interests—reflect a fiduciary relationship between PBMs and plans. *See Last Atlantis Cap.*, 819 F. Supp. 2d at 718 ("Because specialists serve two masters, both the buyer and seller, they 'have no loyalty to buyers *or* sellers, as they execute orders for both.'" (citation omitted)). These statements are better understood as corporate puffery, not indicators of a fiduciary relationship. *Accord* Op. 28 ("The Court hazards a guess that every service provider … claims to have the best interest of his clients in mind."). That is underscored by Plaintiffs' allegation that "most health

plans accept the standard formularies that the PBMs offer." SAC ¶ 192. As the Court noted, such an arrangement is *not* a "hallmark[]" of a "relationship giving rise to a fiduciary duty." Op. 27.

Moreover, Plaintiffs have admitted that their PBM contracts "*disclaim* all fiduciary duties." MTD Hearing Tr. 51 (emphasis added). That is a powerful factor weighing against the existence of such a duty. *See, e.g., Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 266 F. Supp. 2d 826, 829 (N.D. Ill. 2003) (holding that contract's "express disclaimer" of a fiduciary relationship was "clearly" dispositive). Particularly given that admission, the marketing statements that Plaintiffs cite do not plausibly support the existence of a fiduciary duty. The PBM decisions that they previously relied upon did not consider either the dual-loyalty problem or the disclaimer of a fiduciary duty, and so do not support their claims.

The SAC thus still fails to support a fiduciary relationship, and the Court should join others in again holding that PBMs are *not* plans' fiduciaries when negotiating drug rebates. *E.g., Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 476 & n.6 (7th Cir. 2007); *In re Express Scripts, Inc., PBM Litig.*, 2008 WL 2952787, at *11 (E.D. Mo. July 30, 2008).

## B. No alleged payments crossed the buyer–seller line.

Plaintiffs' RPA claim also fails because the alleged payments by Biogen to PBMs did not cross the buyer–seller line. Section 2(c) of the RPA prohibits a party to a "sale or purchase of goods" from paying "anything of value … to the other party to such transaction," unless the payment is "for services rendered." 15 U.S.C. § 13(c). In other words, a payment must pass between a buyer and a seller of goods (as opposed to a transaction for services). *See, e.g., Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir. 1985) ("[T]he common thread has been the passing of illegal payments from seller to buyer or vice versa."); *see also Freeman v. Chic. Title & Tr. Co.*, 505 F.2d 527, 529–30 (7th Cir. 1974) (holding that § 2(c) requires a payment for "tangibles").

Plaintiffs concede that payments between Biogen and PBMs do *not* cross the buyer-seller line. They allege that "PBMs are *not* buyers of Tecfidera, Vumerity or the competing generic products."

SAC ¶ 238 (emphasis added). Instead, they allege that Biogen sold the drugs to wholesalers and/or specialty pharmacies, which sold them to others. *Id.* ¶ 110. Nowhere in that supply chain do PBMs take title to drugs. *See, e.g.*, *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 409–13 (E.D.N.Y. 2007) (holding that PBMs were not purchasers for RPA claim). Nor are plans like Plaintiffs buyers: Plans similarly never acquire title to drugs and instead merely provide reimbursement for patients' purchases. SAC ¶ 142; *supra* 3-5; *see also* Ex. A.

## IV. The Court should dismiss Plaintiffs' new RICO claim (Count 6), both because *Illinois Brick* bars it and because Plaintiffs fail to allege key elements.

Plaintiffs for the first time try reframing their allegations as a RICO claim. SAC ¶¶ 538–86. The Seventh Circuit has repeatedly cautioned about overusing RICO, which is not a vehicle for challenging ordinary commercial conduct. *See, e.g.*, *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) ("garden-variety" business relationships are "not what RICO penalizes"). That, however, is exactly what Plaintiffs seek to do. In addition to their lack of standing under *Illinois Brick* (*supra* § I), their late-breaking attempt at turning this into a RICO case fails for at least two reasons.[12]

### A. Plaintiffs' allegations do not show that Biogen and each of the PBMs shared a common purpose.

Plaintiffs' RICO claim centers on the idea that Biogen formed separate association-in-fact enterprises with five PBMs. SAC ¶ 549. To establish each association-in-fact enterprise, they must plausibly allege that the members shared a "common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). This is essential to showing "an ongoing organization" whose "associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

The Seventh Circuit has consistently held that "a run-of-the-mill commercial relationship[,]"

---

[12] The RICO claim also fails for other reasons. For instance, Plaintiff fails to plausibly allege a pattern of 18 U.S.C. § 1954(4) violations. That statute carves out "bona fide … payments," such as the rebates and fees that were (a) paid in the ordinary course of business, (b) disclosed to the health plans, and (c) expressly recognized under federal law. Given space constraints—and the strength of its other arguments—Biogen reserves these and other arguments for the unlikely event that Plaintiffs' RICO claims are permitted to proceed.

where each entity acts in its individual capacity to pursue its individual self-interest," does *not* establish an association-in-fact enterprise with a common purpose. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (collecting cases); *see also, e.g.*, *Crichton*, 576 F.3d at 400 ("[D]escrib[ing] the ordinary operation of a garden-variety marketing arrangement … is insufficient to state a RICO claim based on an association-in-fact enterprise."). Otherwise, "every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000).

Plaintiffs' allegations fail under this rule. Although Biogen and PBMs sit on opposite sides of the negotiating table (*e.g.*, SAC ¶ 165), Plaintiffs say they shared the purpose of "selling, promoting, recommending for purchase, and administering prescriptions for Tecfidera and Vumerity, and deriving secret profits from those activities through the bribery and kickback scheme described in this Complaint." *Id.* ¶ 550. That, however, is just a nefarious characterization of each entity pursuing its "individual self-interest." *Bible*, 799 F.3d at 655–56. As Plaintiffs recognize, it is in Biogen's interest to secure favorable formulary terms for its drugs, so that those drugs are available to patients. *E.g.*, SAC ¶ 159(d). Similarly, it is in each PBM's interest to secure favorable rebates. *E.g.*, SAC ¶¶ 158(f), 166. Plaintiffs cannot simply generalize those distinct interests into an abstract, shared purpose to profit.

Moreover, it is implausible that Biogen shared this purpose with all five of the PBMs identified as putative co-conspirators in the complaint. Plaintiffs do not claim that the PBMs all agreed *with one another* to advance any objective—just that each shared with Biogen the identical purpose of promoting branded Tecfidera and Vumerity. *E.g.*, SAC ¶¶ 6, 549–50. Plaintiffs also recognize that PBMs *compete* with each other on cost. *Id.* ¶ 166. It is thus implausible that each of the largest PBMs would seek to increase costs on health plans, when a competitor could take its business by offering better savings. Plaintiffs offer no allegations to fill this plausibility gap.

**B.** **Plaintiffs do not plausibly allege that Biogen operated or managed the supposed enterprises.**

Even if they had adequately alleged association-in-fact enterprises, Plaintiffs would need to go further and plausibly plead that Biogen "conducted or participated in the conduct of the '*enterprise's* affairs,' not just [its] *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). They fail to do so.

This is an especially difficult requirement to satisfy in the context of commercial relationships. The Seventh Circuit has stressed that, where allegations "are entirely consistent with … each [enterprise member] going about its own business" within "the bounds of the parties' normal commercial relationships," the members are conducting their own affairs—not the enterprise's affairs. *United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 855–56 (7th Cir. 2013). The *United Food* plaintiff claimed that a pharmacy chain (Walgreens) and drug manufacturer (Par) worked together to defraud insurers by filling prescriptions for generic drugs with a form that was more expensive than the form used by physicians. *Id.* at 850. That plaintiff also alleged "various communications" through which Par encouraged Walgreens to engage in this practice and Walgreens agreed to do so. *Id.* at 854. Still, the Seventh Circuit held that these interactions "are entirely consistent with Walgreens and Par each going about its own business." *Id.* at 855. Although the allegations showed that the companies must "'cooperate' in order for drugs to reach consumers, such cooperation describes virtually every prescription pharmaceutical distribution chain," and does not provide "a basis for inferring that Walgreens and Par were conducting the enterprise's affairs." *Id.* at 856.

So, too, here. Plaintiffs target industry-standard interactions: negotiating formulary placements. *E.g.*, SAC ¶ 142. They cannot explain how those interactions "exceeded th[e] [cooperation] inherent in every commercial transaction between a drug manufacturer and" PBM. *United Food*, 719 F.3d at 856. They thus do not show that Biogen conducted an enterprise's affairs, as opposed to its own business.

## CONCLUSION

The Second Amended Complaint should be dismissed in its entirety, with prejudice.

Dated: October 10, 2025

Respectfully submitted,

/s/ *Eddie Hasdoo*
Eddie Hasdoo
**JONES DAY**
110 North Wacker Drive
Chicago, IL 60606
(312) 269-4214
ehasdoo@jonesday.com

/s/ *Lin Kahn*
Lin Kahn *(pro hac vice)*
**JONES DAY**
555 California St., 26th Floor
San Francisco, CA 94104
(415) 875-5711
lkahn@jonesday.com

Julie McEvoy *(pro hac vice)*
William D. Coglianese *(pro hac vice)*
**JONES DAY**
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
jmcevoy@jonesday.com
wcoglianese@jonesday.com

*Counsel for Defendant Biogen Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 10, 2025, a true and accurate copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois by filing through the CM/ECF system, which served a copy of the foregoing upon all counsel of record.

/s/ *Lin Kahn*
Lin Kahn