# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| *In re Tecfidera Antitrust Litigation* | Case No. 1:24-cv-07387 |
| This Document Relates to All Actions | Hon. April M. Perry |

## PLAINTIFFS' OPPOSITION TO DEFENDANT BIOGEN INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   LEGAL STANDARD..........................................................................................3

III.  ARGUMENT......................................................................................................4

    A.   PLAINTIFFS PLAUSIBLY ALLEGE SHERMAN ACT SECTION
        1 CLAIMS .................................................................................................4

    B.   PLAINTIFFS PLAUSIBLY ALLEGE A SHERMAN ACT SECTION 2
        MARKET-SWITCH CLAIM ..................................................................... 14

    C.   PLAINTIFFS PLAUSIBLY ALLEGE A SHERMAN ACT SECTION 2
        OVERALL-SCHEME CLAIM ................................................................... 19

    D.   *ILLINOIS BRICK* DOES NOT BAR PLAINTIFFS' ROBINSON-PATMAN
        OR RICO CLAIMS.................................................................................... 20

    E.   PLAINTIFFS PLAUSIBLY ALLEGE A ROBINSON-PATMAN ACT
        SECTION 2(C) CLAIM ............................................................................ 22

          1.   The PBMs Breached Fiduciary Duties to Their
               Health-Plan Clients.................................................................... 22

          2.   Biogen's Payments to the PBMs Crossed the
               Buyer-Seller Line ...................................................................... 24

    F.   PLAINTIFFS STATE A RICO CLAIM BASED ON 18 U.S.C. § 1954(4)........... 25

          1.   Each Biogen-PBM Pricing Enterprise Had a Common
               Purpose..................................................................................... 26

          2.   Biogen Participated in the Operation or Management
               of the Biogen-PBM Pricing Enterprises .......................................... 28

    G.   PLAINTIFFS PLAUSIBLY ALLEGE ANTITRUST STANDING FOR
        INJUNCTIVE RELIEF.............................................................................. 28

IV.  CONCLUSION ................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Cases**

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*,
   369 F.3d 732 (3d Cir. 2004) ......................................................................................... 30

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
   881 F.2d 1396 (7th Cir. 1989) ...................................................................................... 24

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
   432 F. Supp. 2d 408 (D. Del. 2006) ...................................................................... 14, 24

*Accord In re Lorazepam & Clorazepate Antitrust Litig.*,
   *531 F. Supp. 2d 82, 90 (D.D.C. 2008)* ........................................................................ 25

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
   2008 WL 11387062 (N.D. Cal. Sep. 25, 2008) ........................................................... 12

*Aetna Cas. & Sur. Co. v. P & B Autobody*,
   43 F.3d 1546 (1st Cir. 1994) ........................................................................................ 28

*Allstate Ins. Co. v. Seigel*,
   312 F. Supp. 2d 260 (D. Conn. 2004) .......................................................................... 28

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ..................................................................................................... 20

*In re Asacol Antitrust Litig.*,
   233 F. Supp. 3d 247 (D. Mass. 2017) .......................................................................... 18

*Associated Radio Serv. Co. v. Page Airways, Inc.*,
   624 F.2d 1342 (5th Cir 1980) ...................................................................................... 19

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
   2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) .............................................................. 5

*Bell Atl. Co. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... 3

*Berkey Photo, Inc. v. Eastman Kodak, Co.*
   603 F.2d 263 (2d Cir. 1979) ........................................................................................ 14

*Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*,
   712 F. Supp. 3d 499 (D. Vt. 2024) ....................................................................... 16, 18-19

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   881 F. Supp. 1309 (W.D. Wis. 1994) .......................................................................... 25

*Bonte v. U.S. Bank, N.A.*,
   624 F.3d 461 (7th Cir. 2010) ......................................................................................... 4

*Boyle v. U.S.*,
   556 U.S. 938 (2009) ................................................................................................ 26

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................................... 29-30

*Chicago Bd. of Trade v. U.S.*,
   246 U.S. 231 (1918) .................................................................................................. 5

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ................................................................................ 19

*Clark Equip. Co. v. Lift Parts Mfg. Co.*,
   1986 WL 4423 (N.D. Ill. Apr. 8, 1986) .................................................................. 19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .................................................................................................. 4

*In re Copaxone Antitrust Litig.*,
   2025 WL 961538 (D.N.J. Feb. 27, 2025) ............................................................... 15

*In re Core Commc'ns, Inc.*,
   455 F.3d 267 (D.C. Cir. 2006) .................................................................................. 5

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ......................................................... 30

*Damon Corp. v. Geheb*,
   1982 WL 1927 (N.D. Ill. Nov. 23, 1982) ............................................................... 12

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
   472 F. Supp. 385 (E.D.N.Y. 2007) ......................................................................... 25

*In re EpiPen Direct Purchaser Antitrust Litig.*,
   2021 WL 147166 (D. Minn. Jan. 15, 2021) .............................. 12, 18, 22, 29, 33-34

*Exeed Indus., LLC v. Younis*,
   2016 WL 128063 (N.D. Ill. Jan. 12, 2016) ............................................................ 26

*In re Express Scripts, Inc. PBM Litig.*,
   522 F. Supp. 2d 1132 (E.D. Mo. 2007) .................................................................. 23

*Feldman v. Health Care Serv. Corp.*,
   562 F. Supp. 941 (N.D. Ill. 1982) .......................................................................... 25

*Fox Midwest Theatres, Inc. v. Means*,
   221 F.2d 173 (8th Cir. 1955) .................................................................................. 24

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013) ................................................................................................ 12

*In re Generic Pharms. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................29-30

*In re Glumetza Antitrust Litig.*,
    611 F. Supp. 3d 848 (N.D. Cal. 2020) ..................................................................8

*Grace v. E.J. Kozin Co.*,
    538 F.2d 170 (7th Cir. 1976) ...............................................................................21

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) ..............................................................................................8

*Great Atl. & Pac. Tea Co., Inc. v. FTC*,
    440 U.S. 69 (1979) ...............................................................................................24

*Guaranteed Rate, Inc. v. Barr*,
    912 F. Supp. 2d 671 (N.D. Ill. 2012) ...................................................................26

*In re HIV Antitrust Litig.*,
    656 F. Supp. 3d 963 (N.D. Cal. 2023) ..................................................................16

*Illinois Brick Co. v. Ill.*,
    431 U.S. 720 (1977) .................................................................... 20-22, 25, 28-29

*In re Impax Lab'ys, Inc. v. FTC*,
    994 F.3d 484–88 (5th Cir. 2021) .....................................................................12, 16

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ...........................................................26-28

*Indivior, Inc. v. Alvogen Pine Brook LLC*,
    681 F. Supp. 3d 275 (D.N.J. 2023) ..................................................................13-14, 18

*Jefferson Cnty. Pharm. Ass'n Inc. v. Abbott Labs.*,
    460 U.S. 150 (1983) .............................................................................................24

*John Deere & Co. Repair Serv. Antitrust Litig.*,
    703 F. Supp. 3d 862 (N.D. Ill. 2023) .................................................................20-22

*Kartell v. Blue Shield of Mass., Inc.*,
    749 F.2d 922, 926 (1st Cir. 1984) ........................................................................25

*In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y 2019) ..............................................................16, 18

*Khan v. BDO Seidman, LLP*,
    408 Ill. App. 3d 564 (2011) .................................................................................23

*In re Lantus Direct Purchaser Antitrust Litig.*,
    512 F. Supp. 3d 106 (D. Mass. 2020) ....................................................................9

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ............................................................................................ 19

*Loc. Beauty Supply, Inc. v. Lamaur Inc.*,
787 F.2d 1197 (7th Cir. 1986) ........................................................................................ 30

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) .......................................................................................... 20

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
379 F. Supp. 2d 968 (N.D. Ill. 2005) .............................................................................. 24

*In re Loestrin 24 FE Antitrust Litig.*,
433 F. Supp. 3d 274 (D.R.I. 2019) ............................................................................ 15-18

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) .......................................................................................... 20

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
462 F. Supp. 1072 (N.D. Ill. 1978) ................................................................................. 15

*Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*,
675 F.2d 502, 505 (2d Cir.1982) ..................................................................................... 25

*Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*,
671 F. Supp. 1139, 1152 (E.D. Mich. 1987) ................................................................... 25

*Multistate Legal Stud, Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
63 F.3d 1540 (10th Cir. 1995) .......................................................................................... 8

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ............................................................................................. 7

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) .............................................................................. 12

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
630 F. Supp. 3d 968 (N.D. Ill. 2022) ............................................................................... 5

*In re Pharm. Indus. Average Wholesale Price Litig.*,
307 F. Supp. 2d 196 (D. Mass. 2004) ........................................................................ 26-27

*Phoenix Bond & Indem. Co. v. Bridge*,
477 F.3d 928 (7th Cir. 2007) .......................................................................................... 30

*Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
814 F.2d 358 (7th Cir. 1987) ............................................................................................ 8

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
593 F. Supp. 2d 29 (D.D.C. 2008) .................................................................................. 29

v

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717–39 (7th Cir. 2004) ................................................................................... 10

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ..................................................................................................... 28

*Rochester Drug Co-op., Inc. v. Braintree Lab'ys*,
  712 F. Supp. 2d 308 (D. Del. 2010) ............................................................................... 9

*Roland Mach. Co. v. Dresser Indus., Inc.*,
  749 F.2d 380 (7th Cir. 1984) ........................................................................................ 11

*SanDisk Corp. v. Kingston Tech. Co.*,
  2010 WL 11595034 (W.D. Wis. Nov. 15, 2010) ............................................................ 19

*Sanitation Equip. Ltd. v. Thetford Corp.*,
  1984 WL 820 (N.D. Ill. June 28, 1984) .......................................................................... 19

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
  2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ............................................................... 18

*In re Solodyn Antitrust Litig.*,
  2015 WL 5458570 (D. Mass. Sept. 16, 2015) ................................................................ 18

*State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*,
  730 F. Supp. 826–09 (C.D. Ill. 1990) ............................................................................. 19

*In re Suboxone Antitrust Litig.*,
  2017 WL 36371 (E.D. Pa. Jan. 4, 2017)......................................................................... 19

*In re Suboxone Antitrust Litig.*,
  622 F. Supp. 3d 22 (E.D. Pa. 2022) ................................................................... 9, 14, 16, 18

*In re Suboxone Antitrust Litig.*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014) ........................................................................... 16, 18

*In re Suboxone*,
  967 F.3d 264 (3d Cir. 2020).......................................................................................... 19

*In re Surescripts Antitrust Litig.*,
  608 F. Supp. 3d 629 (N.D. Ill. 2022) ......................................................................... 28, 29

*U.S. Gypsum Co. v. Indiana Gas Co.*,
  350 F.3d 623 (7th Cir. 2003) ..................................................................................... 28, 29

*U.S. v. Palmeri*,
  630 F.2d 192 (3d Cir. 1980)........................................................................................ 3, 22

*U.S. v. Soures*,
  736 F.2d 87 (3d Cir. 1984) ........................................................................................... 22

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ........................................................................................ 27

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ............................................................ 11

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ...................................................................................................... 9

*Viamedia Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ...................................................................................... 14

*In re Warfarin Sodium Antitrust Litig.*,
  214 F.3d 395 (3d Cir. 2000) .......................................................................................... 7

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 1994) ........................................................................................ 25

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2021 WL 6690351 (E.D. Va. Aug. 17, 2021) .............................................................. 6


**Statutes**

18 U.S.C. § 1954 .....................................................................................3, 21-22, 25

Fla. Stat. § 465.025 ...................................................................................................... 6

IL ST. CH 225 § 85/25 ................................................................................................. 7

N.Y. Educ. Law § 6810 ................................................................................................ 6

NY Educ. Law § 6816-a ............................................................................................... 6

NY Educ. Law § 6826 ................................................................................................. 13

Robinson-Patman Act, Section 2(c) ..................................................................*passim*

Plaintiffs[1] respectfully submit this brief in opposition to Defendant Biogen Inc.'s ("Biogen") Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 99 ("SAC")).

## I.  INTRODUCTION

The SAC fully responds to the Court's concerns with the original complaint (see Opinion and Order, ECF No. 98 ("Op.")). It also develops a substantially more fulsome picture of Biogen's tactics and how they worked together to stymie generic competition and extend Biogen's market power.

Among other things, the SAC alleges in detail that:

- Biogen's interference with health-plan members' cost-share obligations (copayments and coinsurance) impaired generic competition by sending false price signals to members and, for substantial numbers of them, altogether disabling state generic-substitution statutes (responding to Op. at 14-15).

- Biogen paid the Co-Conspirator PBMs to designate generic Tecfidera as a specialty drug, with the purpose and effect of requiring plan members to pay the same high brand-level cost-share for "generic" Tecfidera as for the brands (responding to Op. at 15 n.3).

- Biogen paid the Co-Conspirator PBMs to impose "utilization management" restrictions on generic Tecfidera despite the absence of any medical or economic basis to do so (responding to Op. at 14-15).

- The commercial reality is that health plans do not and cannot choose formularies based on how they treat individual drug products; the plans hire PBMs to do that complex job involving thousands of drugs. The absence of the challenged restraints from some

---

[1] "Plaintiffs" are Local No. 1 Health Fund, Mayor and City Council of Baltimore, Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund, UFCW Local 1500 Welfare Fund, and Jacksonville Police Officers and Fire Fighters Health Insurance Trust.  On October 27, 2025, Plaintiffs filed a Third Amended Complaint to make an administrative change to remove one of the previously named Plaintiffs, New York State Teamsters Council Health and Hospital Fund.  *See* ECF Nos. 119-120.

formularies does not mean that health plans made individual decisions with respect to Tecfidera. On the contrary, the PBMs relied on a variety of considerations in deciding whether to accept Biogen's payoffs and what to provide in exchange for them. Those considerations included the number of patients covered by a given formulary, offers from other brand manufacturers, and the PBMs' specialty pharmacy margins. (responding to Op. at 17-18).

- Biogen's anticompetitive tactics to slow the substitution of generic Tecfidera for brand Tecfidera contributed to Biogen's market switch to Vumerity by giving Biogen the time it needed to make the switch (responding to Op. at 21).

- Biogen systematically represented to doctors and plan members that Vumerity had a substantially better GI-tolerability profile than Tecfidera. Regulatory agencies throughout the world concluded that Biogen's studies showed no such thing—Biogen had rigged the studies in an unsuccessful effort to prove otherwise (responding to Op. at 21-22).

- Biogen paid the PBMs to charge plan members the same high cost-share for generic Tecfidera as for Vumerity, and designating generic Tecfidera as a specialty drug had that same anticompetitive effect (responding to Op. at 22).

- Biogen provided coupons to plan members, regardless of their financial need, that eliminated their cost-share for Tecfidera and Vumerity, sending the false price signal that generic Tecfidera was more expensive than the brands (responding to Op. at 22).

- Biogen's various switch-related tactics eliminated patients' financial incentive to resist the switch from Tecfidera to Vumerity (responding to Op. at 22).

- Biogen leveraged its Tecfidera sales to bolster the switch to Vumerity, making PBMs' rebates and fees on Tecfidera (which at the time had far greater sales) contingent on better formulary placement of Vumerity (responding to Op. at 22).

The SAC asserts that Biogen's payments to the PBMs to disadvantage generic Tecfidera violated Sherman Act Sections 1 and 2 and their state-law analogues; that Biogen's suite of conduct to switch the market from Tecfidera to Vumerity violated Section 2 and its state-law analogues; and that Biogen's overall anticompetitive scheme to impair competition from generic Tecfidera—encompassing all Biogen's anti-generic tactics—violated Section 2 and its state-law analogues.

The SAC also directly responds in two ways to the Court's prior discussion of whether Plaintiffs had sufficiently alleged that the Co-Conspirator PBMs have a fiduciary duty to their health-plan clients sufficient to support claims under Section 2(c) of the Robinson-Patman Act. *See* Op. at 28-29. First, Plaintiffs have identified specific marketing statements by each of the Co-Conspirator PBMs touting their expertise, committing to align their interests with their health plan clients, and promising to lower the plans' costs by promoting generics on their formularies. Those statements show that the PBMs "held themselves out as trustworthy experts in formulary design," which prior case law has found sufficient to allege that PBMs owe fiduciary duties to health plans. Op. at 28.

Second, Plaintiffs have asserted a RICO claim based on Biogen's violation of 18 U.S.C. § 1954(4), which prohibits giving or offering bribes, kickbacks, or other conflict-of-interest payments to service providers for ERISA plans for the purpose of influencing plan decisions. Unlike under Section 2(c) of the Robinson-Patman Act, courts have rejected the "contention that § 1954 applies only to persons in a fiduciary relationship to the employee benefit plan."[2] Plaintiffs plead a sub-class of ERISA plans that received services from one or more of the Co-Conspirator PBMs.

## II. LEGAL STANDARD

A complaint need allege only "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Co. v. Twombly,* 550 U.S. 544, 570 (2007). This standard "simply calls for enough fact[s]

---

[2] *See U.S. v. Palmeri*, 630 F.2d 192, 200 (3d Cir. 1980).

to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. A court must "accept all facts in the complaint as true, view them in the light most favorable to the [plaintiffs], and draw all reasonable inferences in their favor." *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 463 (7th Cir. 2010). And the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

## III.    ARGUMENT

### A. PLAINTIFFS PLAUSIBLY ALLEGE SHERMAN ACT SECTION 1 CLAIMS.

It is undisputed on this motion that Biogen has a monopoly over the fumarate market (Tecfidera, Vumerity, and generic Tecfidera). Plaintiffs assert that Biogen violated Sections 1 and 2 of the Sherman Act, and corresponding state-law provisions, by paying kickbacks to the Co-Conspirator PBMs to maintain and extend that monopoly. Biogen's payments to the PBMs—its sharing monopoly profits with them—was contingent on their disadvantaging generic Tecfidera on formularies, designating generic Tecfidera as a specialty drug, or subjecting generic Tecfidera to step edits and prior authorizations. SAC ¶¶ 230-303. Biogen offered PBMs a menu of payments calibrated to the degree to which they disadvantaged generic Tecfidera. SAC ¶ 229.[3]

**Disadvantaged Formulary Placement**. Absent kickbacks, generics' dramatically lower prices earn them better placement on formularies compared to the brand. *Id*. ¶ 232-235. Lower cost-sharing (copayments and coinsurance) for plan members harmonizes health plans' and members' interests in using low-cost generics when possible. Lower cost-share obligations give members the accurate price signal that the generic costs substantially less, and members are likely to react to those price signals by demanding or accepting the generic. *Id*. ¶¶ 233-34. State pharmacy laws also actively promote generic

---

[3] Plaintiffs use the term "disadvantage" advisedly. See footnote 5 and accompanying text below.

substitution when the generic costs members less than the brand. *Id.* ¶¶ 134-135. Just as Congress and the states intended, the lower prices for members rapidly erode the brand's monopoly power. *Id.* ¶¶ 138-139.

Biogen paid the PBMs to place generic Tecfidera on the same or worse formulary tier as Tecfidera, even though it cost four times as much as the generic. *Id.* ¶¶ 231, 240. This sent members the false price signal that Biogen's Tecfidera cost the same as (or less than) the generic. *Id.* ¶¶ 231-247. Biogen's payments to the PBMs disabled the price mechanism—accurate price signals—on which price competition depends. The price mechanism "is the 'central nervous system' of the economy," *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940), and protecting price competition is "an object of special solicitude under the antitrust laws," *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 148 (1966). Undermining buyers' "ability to utilize and compare prices … [o]n its face … restrains trade within the meaning of § 1 of the Sherman Act." *Nat'l Soc'y. Prof'l. Eng'rs v. U.S.*, 435 U.S. 679, 692–93 (1978).[4]

Biogen nevertheless suggests that liability is precluded to the extent that its payments procured "equal treatment" between generic Tecfidera and Tecfidera on the PBMs' formularies. Mot. at 20. Not so. Sending the same price signal for two identical products, one of whose costs is 400% greater than the other's, is not "equal treatment."[5] It is a massive interference with price competition. The right antitrust metric is whether Biogen's payments resulted in generic Tecfidera's being placed worse relative to Tecfidera *than it would have been absent the payments*.[6] There is no safe harbor for being placed the same

---

[4] *See also, e.g.*, *In re Core Commc'ns, Inc.*, 455 F.3d 267, 272 (D.C. Cir. 2006) (unlawful to cause "customers [to] not receive accurate price signals" or to receive "inaccurate price signals"); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 980 (N.D. Ill. 2022) (unlawful to interfere with the "flow of information between [buyer and seller]" because it "disrupt[s] the normal bargaining and price-setting mechanisms that apply in competitive []markets"); *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *20 (E.D.N.Y. Nov. 20, 2019) (unlawful to interfere with price signals and thereby impair buyers' "migrat[ing] towards less-expensive payment products").

[5] Even counting the kickbacks as price reductions to the health plans, branded Tecfidera and Vumerity cost four times more than generic Tecfidera. SAC ¶¶ 240. Generics earn *better* formulary placement than brands on kickback-free formularies, so giving generic Tecfidera *the same* placement as the brands—where placement determines members' cost-share obligations—undermines the price competition that antitrust law protects.

[6] *See, e.g.*, *Chicago Bd. of Trade v. U.S.*, 246 U.S. 231, 238 (1918) (rule of reason compares competition "before

as Tecfidera. "Equal" placement with Tecfidera deprived the generics of their huge price advantage and deprived buyers of the lower prices that the generics would have delivered. SAC ¶¶ 248-250.

Moreover, for some health plans the rigged formulary placement disabled state generic-substitution laws that permit or mandate generic substitution only if the generic will be less expensive for the patient. SAC ¶¶ 231, 253-55 & App'x A. Disabling regulatory support for generic substitution, like interfering with price signals, is plainly anticompetitive. Op. at 13 ("healthy competition in prescription drug markets requires the smooth operation of drug substitution laws").

Biogen tries to cast doubt on the meaning of a few of the statutes (Mot. at 23), but each of them is fully consistent with Plaintiffs' allegations. New York's mandatory-substitution law requires substitution only to a "less expensive product." NY Educ. Law § 6816-a(1). Biogen argues that other parts of the statute clarify that this means *less expensive for a hypothetical retail purchaser* (by which Biogen apparently means an *uninsured* customer) rather than *less expensive for the insured patient who is actually buying the drug* (Mot. at 23), but Biogen's cited provisions are wholly unrelated and irrelevant.[7] Uninsured customers account for less than 10% of all drug purchases. SAC ¶ 175. Biogen would read the New York statute to *mandate* the substitution of a generic—require it *over a patient's objection*—where the generic would be "less expensive" to <10% of patients but is not less expensive to the 90+% of patients who are buying the drug. That reading is wholly implausible.

Florida's statute similarly mandates substitution of a "less expensive, generically equivalent drug product." Fla. Stat. § 465.025(2). Biogen points to regulations that apply *additional* prerequisites to substitution (Mot. at 23, citing Fla. Admin. Code Ann. r. 64B16-27.530), but, contrary to Biogen's

---

and after the restraint was imposed"); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6690351, at *7 (E.D. Va. Aug. 17, 2021) (parties must "provide an economic analysis free of the challenged conduct"), *aff'd*, 566 F. Supp. 3d 509 (E.D. Va. 2021). *See also* footnote 20 *infra*.

[7] *See* Mot. at 23, citing N.Y. Educ. Law § 6810(6)(a) (defining when a pharmacy may dispense a brand at its regular price because the generic is not available), and § 6826 (requiring pharmacies to make retail price lists available to customers, (which helps them decide whether to pay cash rather than possibly pay a copayment higher than the cash price)).

assertion, the regulations do not define the statutory language "less expensive" or in any way suggest that it refers solely to the prices paid by hypothetical cash-paying customers rather than by all customers who buy the drug, including insured customers, who account for more than 90% of all purchases.[8]

In other generic-suppression cases, the details of state substitution statutes, and how they in fact operate in the commercial world, have been addressed in expert reports in later stages of the litigation.[9] For now, Biogen has cited nothing to contradict the SAC's allegations that these statutes turn on whether the generic is less expensive for the patient who is buying the drug, not just for the small minority of patients who pay cash. Plaintiffs' reading is uncontradicted and entirely plausible.[10]

**Disadvantaged Specialty-Drug Designation**. In exchange for Biogen's payments, the PBMs agreed to designate generic Tecfidera as a specialty drug if they so designated Tecfidera. SAC ¶¶ 258-272. The designation required that members buy their generic Tecfidera from one of the "specialty pharmacies" affiliated with the Co-Conspirator PBMs. *Id*. ¶¶ 11, 262. Branded Tecfidera and Vumerity were designated as specialty drugs based solely on their astronomical prices—a millstone that generic Tecfidera did not carry. *Id*. ¶¶ 258, 261-262, 393.

The specialty designations for generic Tecfidera required members to pay high, brand-level cost-share amounts for the nominally "generic" Tecfidera. *Id*. ¶ 262, 267. That is anticompetitive and unlawful for all the reasons discussed above regarding distorted cost-shares sending false price signals and disabling generic-substitution statutes. Those designations also directly raise prices on "generic" units for both sets of buyers— members and health plans (*id*. ¶¶ 262-266)—and are unquestionably anticompetitive for that reason too. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) ("[i]t is

---

[8] Biogen similarly fails to cite anything that would contradict the SAC's allegation that the Illinois statute's reference to a lower "unit price" (IL ST. CH 225 § 85/25) means the price that the patient pays.

[9] *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 657 n.32 (2d Cir. 2015) ("*Namenda*") (noting expert testimony regarding state substitution laws).

[10] *See, e.g.*, Maya Lorey, *Insurance Coverage and Induced Infringement: A Threat to Hatch-Waxman's Skinny Labeling Pathway?,* 90 U. Chi. L. Rev. 1517, 1550–51 (2023) (state substitution statutes condition substitution on copay being less for generic than for brand, citing Florida statute as an example).

difficult to imagine a more formidable demonstration of antitrust injury"); *In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 862 (N.D. Cal. 2020) (higher generic prices paid as a result of defendants' creation of a "brand-versus-generic duopoly" are a distinct antitrust violation).

Biogen argues that its conduct did not prevent generic-drug manufacturers from entering the market. Mot. at 23, 24. True, but irrelevant. Biogen's conduct attacked a different level of the distribution chain. Generic manufacturers sold their product to the PBMs' affiliated specialty pharmacies at competitive prices; the intended result of the Biogen/PBM pacts was to nevertheless require plan members to incur much higher, brand-level cost-share obligations, and require health plans to pay outrageous specialty-drug prices, for the nominally "generic" products. SAC *Id*. ¶¶ 147, 262, 264-267, 271.

**Disadvantaged Dispensing Restrictions**. When the branded product is very expensive and lower-priced alternatives are available, PBMs frequently control cost by employing "utilization management" techniques: specifically, imposing step edits and prior authorizations as a condition of plan coverage. SAC *Id*. ¶¶ 274-278. Biogen paid the PBMs to impose these dispensing restrictions on generic Tecfidera, for which there was no legitimate economic or medical basis. *Id*. ¶ 276.

Contrary to Biogen's assertion (Mot. at 21 n.8), the SAC alleges that Biogen knew and intended that these restrictions would impair the uptake of generic Tecfidera. *Id*. ¶ 273.[11] A monopolist's paying to impose restraints on entering rivals—instead of competing on price against them—is anticompetitive and unlawful.[12] Nor is it true (contra Mot. at 16, 21) that a named plaintiff must separately establish standing to challenge each aspect of multi-pronged anticompetitive agreements or schemes.[13]

---

[11] For example, the SAC alleges that these red-tape requirements prohibited members from receiving generic Tecfidera unless they first "failed" on the bioequivalent Tecfidera. SAC ¶¶ 275-277.

[12] *See, e.g*., *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.,* 814 F.2d 358, 368 (7th Cir. 1987); *Multistate Legal Stud, Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.,* 63 F.3d 1540, 1553 (10th Cir. 1995).

[13] Named plaintiffs have standing to pursue the conspiracy claims asserted in Counts One, Two, Seven, and Ten, and the market-switch monopolization claims in Counts Three and Eight, regardless of whether those plaintiffs were injured by every aspect of the agreements. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 265 (2003) (standing

**Plans' Inability to Avoid the Restraints**. Biogen blithely asserts that health plans were "free to switch to a different product." Mot. at 13. That ignores the foundational principle that "'[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.'" Op. at 13 (quoting *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004)). Plaintiffs allege and will prove that: (1) health plans lack the knowledge and expertise to choose each drug's place on a formulary; (2) the plans hire PBMs to perform this function on their behalf; and (3) Biogen paid the PBMs—shared its monopoly profits with them—to act against the plans' interests by impairing generic Tecfidera competition on formularies covering a substantial majority of health-plan members and thereby maintaining those monopoly profits. SAC ¶¶ 248-257, 268-272, 279-283.

The Court previously observed that some plans did not have the challenged restraints and asked why, since some plans avoided the restraints, all plans did not avoid them. Op. at 17. The SAC provides a comprehensive answer. All the PBMs tout that they promote the use of generics to save the health plans money. SAC ¶¶ 156-162. The plans rely entirely on the PBMs for the placement of individual drugs on the formulary. SAC ¶¶ 163-173. The plans cannot "detect or prevent brand manufacturers' and PBMs' anticompetitive conduct with respect to specific drugs." *Id*. ¶ 163. This is "a practical reality in this industry" (*id*. ¶ 164), because, among other reasons, formularies include thousands of drugs; health plans lack the necessary expertise; PBMs unilaterally move drugs around on the formularies; and PBM reports are in the aggregate, not individual-drug, level (*id*. ¶¶ 164-173). Indeed, "[h]ealth plans are not even aware of, let alone in charge of, how the PBM treats a particular drug on the formulary." *Id*. ¶ 169. And if a

---

found where policy that named plaintiffs challenged did not "implicate a significantly different set of concerns" than the related one that injured them); *In re Lantus Direct Purchaser Antitrust Litig.*, 512 F. Supp. 3d 106, 125 (D. Mass. 2020). Named plaintiffs also have standing to pursue the overall-scheme-to-monopolize claims alleged in Counts Four and Nine, regardless of whether those plaintiffs were injured by every aspect Biogen's overall scheme. *See, e.g.*, *Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 317 (D. Del. 2010) ("It is sufficient … for plaintiffs to allege injuries that occurred as a result of the entire scheme, rather than any particular component therein."); *In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22, 78 (E.D. Pa. 2022)**.**

health plan had somehow ferreted out Biogen's unlawful scheme, that discovery would have come too late to stop the injury about which Plaintiffs complain. *Id*. ¶ 173.

The PBMs, not health plans, decided whether to accept the kickbacks for rigging the formulary placement. *Id*. ¶ 284. That some formularies lacked the restraints does not imply otherwise; the PBMs made different decisions with respect to particular formularies based on plan-level variations such as the number of MS patients the plan covers, the rebate offers from other brand manufacturers, and the amount the plan reimburses the PBM's affiliated specialty pharmacy. *Id*. ¶¶ 285-86. In short, some formularies lack the challenged restraints not because health plans knew of generic Tecfidera's treatment and chose to avoid it—they didn't know and didn't choose—but because the PBMs decided that *their interests,* not the plans' interests, were served by Biogen's scheme with respect to certain formularies and not others.

**"Foreclosure" Analysis**. The SAC plainly states a prima facie claim under the rule of reason, which is the only issue on this motion. Biogen nevertheless asserts that it fails to state a claim for "exclusive dealing." That rubric, however, is inapplicable here: exclusive-dealing agreements are between suppliers *and buyers*. *See, e.g.*, *Republic Tobacco Co. v. N. Atl. Trading Co*., 381 F.3d 717, 736–39 (7th Cir. 2004). Buyers can determine whether what they get from the supplier in return for exclusivity is worth the cost. Biogen did not pay rebates *to the health plans* or give them discounts. Biogen paid the kickbacks *to the PBMs* in return for causing the health plans to pay 400% more for fumarates than they should have. *See* SAC ¶¶ 238-241.

Nor did Biogen's payments present the competitive virtues or vices of exclusive dealing. Exclusive agreements with dealers "encourage [them] to specialize in that manufacturer's brand," and to offer consumers of those products "amenities that cost money, such as an attractive store, trained salespeople, long business hours"; exclusivity also prevents the suppliers' rivals from free-riding on those

10

investments.[14] Biogen's payments to the PBMs have nothing to do with the health plans (or the PBMs) providing any costly services to plan members on which generics might free-ride. Nor do Biogen's payments evoke the potential anticompetitive effect of exclusive dealing which is, at high enough levels of market foreclosure, "deny[ing] a competitor access to retailers or distributors without which the competitor cannot make sufficient sales to be viable."[15] The generic manufacturers' viability did not depend on achieving any particular level of scale with respect to generic Tecfidera. Biogen has not contended, and cannot truthfully contend, otherwise.

Biogen impaired generic competition not by depriving generic manufacturers of sufficient scale, but by choking off generic competition at a different point in the distribution chain. Health plans hire PBMs to promote the use of low-cost generics on formularies that cover the plans' members. Instead, Biogen paid the PBMs to disadvantage generics on formularies and, without any good medical reason, to designate the generics as specialty drugs and subject them to prior authorizations or step edits. Biogen's and the PBMs' ability to use those tactics and inflict anticompetitive harm did not depend at all on the number of formularies or members affected.

The analogous anticompetitive conduct here is not exclusive dealing, but paying bribes to purchasing agents and paying entities that control access to generic drugs. Buyers often successfully pair their commercial-bribery claims under Section 2(c) of the Robinson-Patman Act with Sherman Act claims. Bribing purchasing agents to steer business to higher-priced vendors violates both provisions: "if the payments are made not to the customer but to the customer's purchasing agent, and without the customer's knowledge, then the customer's purchasing decisions will be skewed," and the bribes "can constitute agreements in restraint of trade, in violation of section 1 of the Sherman Act, and they can

---

[14] FTC, *Exclusive Dealing or Requirements Contracts*, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-supply-chain/exclusive-dealing-or-requirements-contracts; *see also VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 28, 2015).
[15] FTC, *Exclusive Dealing*, *supra*; *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

constitute predatory behavior contributing to a violation of section 2 of the Sherman Act." *Damon Corp. v. Geheb*, 1982 WL 1927, at *3 (N.D. Ill. Nov. 23, 1982).[16] And brand-drug manufacturers violate Section 1 of the Sherman Act when they pay generic manufacturers to delay entering the market: paying to suppress generic uptake "tend[s] to have significant adverse effects on competition." *FTC v. Actavis, Inc.*, 570 U.S. 136, 148 (2013).[17] Biogen paid PBMs—entities that control access to generics at a different level of the distribution chain than the generic manufacturers in *Actavis*—but the principle is the same: it is anticompetitive for a brand-drug monopolist to impair competition by paying off those that control access to generics. Notably, causing anticompetitive harm in these ways does not depend on the percentage of the market that the conduct affects. There was sufficient volume of generic Tecfidera in the market to drive its price far below that of Tecfidera; the problem was that Biogen's conduct prevented the generics from actually being dispensed despite their massively lower prices. Op. at 14.

If a "foreclosure" requirement applied, Plaintiffs have pled substantial foreclosure, even before considering the "different dynamics at play" in this market and the need to avoid "losing the forest for the trees." Op. at 16. Biogen's formulary-tier tactic eliminated generic Tecfidera's price advantage and sent false price signals to about 40% of members nationwide in 2021, when generics should have been taking hold. *Id.* ¶¶ 231, 249.[18] The payments disabled automatic-substitution laws in states accounting for about

---

[16] S*ee also In re EpiPen Direct Purchaser Antitrust Litig.*, 2021 WL 147166, at *24 (D. Minn. Jan. 15, 2021) (citing *Damon* and other cases, and holding that bribing PBMs is actionable under the Sherman Act where, as here, "it is directed toward suppressing competition in the market"); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144, 147-48 (4th Cir. 1990); *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2008 WL 11387062, at *1 & n.3, *14 (N.D. Cal. Sep. 25, 2008).

[17] *See also*, e.g., *In re Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 487–88 (5th Cir. 2021); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 720-21 (N.D. Ill. 2016). The restraint in *FTC v. Actavis* was horizontal, but the Court applied the rule of reason, which is the standard that applies here because Plaintiffs have forgone, for purposes of this motion, arguing for per se illegality.

[18] Contrary to Biogen's assertion (Mot. at 22 n.9), the SAC establishes that these figures are not substantially affected by considering members who pay coinsurance rather than copayments. SAC ¶¶ 251-252; *see* Op. at 15 n.2. Those same allegations establish that plans with coinsurance-based formularies are also injured by Biogen's formulary-tier and specialty-drug tactics. *Contra* Mot. at 23 n.10. Also contrary to Biogen's assertion (Mot. at 13), the SAC provides the percent of members who are subject to each of the types of restraints and gives a running total for them cumulatively. SAC ¶¶ 248-257, 268-272, 279-283.

80% of the U.S. population, affecting about 32% of plan members. *Id*. ¶ 253-257, 231. About 60% of members were covered by plans that required the brand-level specialty-drug cost-sharing for nominally "generic" Tecfidera. *Id*. ¶ 258. Cumulatively, more than 75% of members were subjected to one or both of the rigged-formulary tactic and the specialty-drug scam. *Id*. ¶ 272. Biogen's payments caused more than 68% of members to encounter prior authorizations or step edits or formularies that placed generic Tecfidera on a tier worse than the usual Tier 1, with significant overlap with those who were also subject to one or both of the Biogen's other two bribe-based tactics. *Id*. ¶¶ 273, 279, 283.

These large percentages are mirrored in the substantial anticompetitive effects. Absent Biogen's anticompetitive conduct, by June 2021 generic Tecfidera would have garnered 90+% of the unit sales of Tecfidera. Instead, by June 2021 the generics got less than 33%; by June 2022 they still had less than 47%; and two years later by June 2024 they still had less than 55%. SAC ¶ 414.[19] Generic Tecfidera "gained significantly less share 'than it likely would have absent the [challenged] conduct.'"[20] Purchasers' lost savings from these differentials is more than $3 billion. *Id*. ¶ 415. Biogen points exclusively to the generics' 55% share in 2024 (Mot. at 22), ignoring that: (1) the immensely impaired uptake before then cost purchasers billions of dollars; and (2) even the 40-point gap between the generics' 55% share in 2024 and the 90+% share they would have had represents hundreds of millions of dollars in lost savings.

Moreover, these figures reflect the percentages of units that generic manufacturers sold to wholesalers and retailers at generic prices. But Biogen's specialty-pharmacy tactic required health plans and their members to pay the outrageous specialty-pharmacy prices for more than 60% of these "generic" units. Absent Biogen's anticompetitive conduct, by June 2021 units sold to members and health plans at *real* generic prices would have been 90+% of sales. Instead, by June 2021 units at *real* generic prices were

---

[19] According to Biogen, this is somehow "rapid" generic uptake. Mot. at 22.
[20] *Indivior*, *Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 302 (D.N.J. 2023) (quoting *McWane*, *Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015)).

a paltry 17%; by June 2022 they were only 24%; and two years later by June 2024 they were still just 28%. SAC ¶ 423. Biogen's specialty-pharmacy tactic has cost purchasers more than $1 billion, in addition to the $3 billion noted above, and the losses continue to accrue. *Id.* ¶ 430.

### B. PLAINTIFFS PLAUSIBLY ALLEGE A SHERMAN ACT SECTION 2 MARKET-SWITCH CLAIM.

Having unlawfully protected Tecfidera from generic competition, Biogen then used coercive tactics to switch the market from Tecfidera to Vumerity, permanently protecting those fumarate units from generic Tecfidera competition. SAC ¶¶ 305-430.

The coercion element that some courts apply to a market-switch claim originated in *Berkey Photo, Inc. v. Eastman Kodak, Co.* 603 F.2d 263, 288 (2d Cir. 1979), which concluded that the element might be satisfied by evidence that the switch "was motivated by a desire to impede competition." Plaintiffs allege in detail that Biogen's market switch flunked the profit-sacrifice test, which means, definitionally, that the conduct's *sole purpose* was to impair competition. SAC ¶¶ 317-321. *See, e.g.*, *Namenda*, 787 F.3d at 659; *Suboxone*, 622 F. Supp. 3d at 66; *accord Viamedia Inc. v. Comcast Corp.*, 951 F.3d 429, 485 (7th Cir. 2020) ("Comcast violated Section 2 of the Sherman Act [by] . . . sacrific[ing] short-term profits to obtain and entrench long-term market power").

Beyond those determinative economic allegations, coercion is confirmed by Biogen's specific tactics. Coercion includes conduct that impedes the ability of patients and doctors to "evaluate the products and their generics on the merits in furtherance of competitive objectives." *Namenda*, 787 F.3d at 654. The standard is "unfettered consumer choice."[21] The SAC abounds with allegations that Biogen impaired such choice. First, it was essential to the scheme that Biogen switch Tecfidera scripts to Vumerity before they were switched to generic Tecfidera. *See* SAC ¶¶ 199-201, 322 (explaining

---

[21] *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 422 (D. Del. 2006); *see also Indivior*, 681 F. Supp. 3d at 303 (jury may find coercion where defendant "possessed a monopoly … and therefore had the power to impose certain exclusionary contract terms on payors ahead of generic entry").

economics). Biogen's conduct discussed above impaired generic substitution for Tecfidera, buying time for Biogen to switch the Tecfidera sales to Vumerity before they were lost to the generics.[22]

Second, Biogen further anticompetitively bolstered the Tecfidera sales base by providing coupons to members, irrespective of their economic need, to negate the health plans' requirements that members pay coinsurance or copayments for Tecfidera. SAC ¶¶ 287-300.[23] Like Biogen's eliminating formularies' cost-share differentials between brand and generic Tecfidera, the coupons provided false price signals to members regarding the products' relative costs. *Id*. Biogen's tactic is so blatantly anticompetitive that the federal government has outlawed it with respect to drugs sales for which taxpayers foot the bill. *Id*. ¶¶ 296-300. Biogen cites *In re Copaxone Antitrust Litig*., 2025 WL 961538 (D.N.J. Feb. 27, 2025), but there the coupon use "overwhelmingly occurred" *only* before the generic was available. *Id*. at *26. Biogen admits that it provided patient coupons both before and *after* generic Tecfidera was available. Mot. at 24-25. Regardless of whether Biogen's coupons were competitively innocuous before generic entry, they became anticompetitive when Biogen used them as part of its campaign against generic Tecfidera.[24]

Third, Biogen concocted a claim that Vumerity was medically superior to Tecfidera and then massively marketed that false claim to doctors and patients. SAC ¶¶ 331-383.[25] Biogen was disparaging its own product, so no other brand manufacturer had an incentive to counter it, and free-rider problems

---

[22] Biogen says that it "promoted" Tecfidera, which is supposedly "the exact opposite" of switching scripts to Vumerity. Mot. at 15. The SAC alleges that what Biogen calls "promoting" Tecfidera consisted of using anticompetitive tactics to impair generic competition, and that one of the purposes of that impairment was to protect the Tecfidera sales base so that Biogen could switch it to Vumerity. SAC ¶¶ 15, 238, 305, 322, 375-379.

[23] *See, e.g.*, *In re Loestrin 24 FE Antitrust Litig.*, 433 F. Supp. 3d 274, 331 (D.R.I. 2019) (anticompetitive tactics included "implementing a patient savings program").

[24] *See, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 462 F. Supp. 1072, 1084 (N.D. Ill. 1978) (**"**acts which may be legal and innocent in themselves, standing alone, lose that character when incorporated into a conspiracy to restrain trade"(quoting *Kurek v. PleasureDriveway & Park Dist. of Peoria*, 557 F.2d 580, 587 (7th Cir. 1977)); *Nuance Commc'ns, Inc. v. Omilia Nat. Language Sols., Ltd.*, 2020 WL 2198362, at *4 (D. Mass. May 6, 2020) (**"**acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme") (quoting *Cont'l Ore.*, 370 U.S. at 707).

[25] Biogen invites the Court (Mot. at 17) to ignore the SAC's detailed allegations and substitute its own reading of a study that in fact numerous experts have debunked. SAC ¶¶ 340-359.

prevented the generic manufacturers from countering it. *Id*. ¶¶ 338-39. Regardless of whether such false marketing supports an independent antitrust claim (Mot. at 17), it clearly supports a conclusion of coercion in a market-switch claim.[26] Biogen now tries to downplay the significance of the comparative side-effects of Tecfidera and Vumerity. Mot. at 18. Biogen aggressively marketed exactly those false comparisons, so it is plainly plausible that they were significant enough to help motivate switches.

Fourth, Biogen undermined generic Tecfidera's price advantage over Vumerity. SAC ¶¶ 384-398. Purporting to rely on the SAC, Biogen asserts that no pricing-related tactics can support a conclusion of coercion because doctors and patients do not choose between brand and generic drugs based on cost. Mot. at 15. The SAC merely explains that *brand versus brand competition* is usually insufficient to avoid monopoly prices because doctors "typically are not aware of *the relative costs of brand* pharmaceuticals." SAC ¶ 125. In contrast, "[a]nyone who buys pharmaceuticals knows that generic drugs are cheaper than their brand counterparts." *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 488 (5th Cir. 2021); *see* SAC ¶¶ 4, 134, 137-139, 144. The lack of strong price competition *among branded drugs* is exactly what makes *generic competition*—the competition that Biogen impaired—so important. *Id*. ¶¶ 130, 134-135.[27]

The SAC explains that undermining generic Tecfidera's massive price advantage over Vumerity eliminated patients' and doctors' incentives to resist the switch from Tecfidera (prescriptions for which would be filled with the generic) to Vumerity. *Id*. ¶ 20.[28] These pricing tactics included:

---

[26] *See, e.g.*, *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 20 (S.D.N.Y 2019) ("false advertising was "not readily susceptible of neutralization or other offset by rivals"); *Suboxone*, 622 F. Supp. 3d at 70 (defendant was "the lone voice pitting one of its products against the other and controlling the entire flow of information to physicians, insurers, and the public"); *Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 543 (D. Vt. 2024) ("intense outreach campaign through its sale force" and other tactics "considered together" sufficiently pleaded coercion); *Loestrin*, 433 F. Supp. 3d at 331 (same); *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 682-83 (E.D. Pa. 2014) (same) .

[27] Biogen stitches together snippets from *HIV* (Mot. at 16), but that court merely held *on a summary judgment record* that those plaintiffs "ha[d] not explained" how a difference in price *among branded drugs* was coercive based "on that evidence by itself." *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 977-78 (N.D. Cal. 2023).

[28] *See, e.g.*, *Blue Cross*, 712 F. Supp. 3d at 543 (artificial price disparities between products supports finding of coercion).

- Biogen paid the PBMs to not place generic Tecfidera on a better formulary tier than Vumerity, eliminating generic Tecfidera's price advantage over Vumerity on formularies covering about 28% of plan members. SAC ¶¶ 384-390. Biogen notes the Court's prior statement that placing generic Tecfidera on the same tier *as Tecfidera* would not necessarily interfere with price competition between generic Tecfidera and Vumerity. Mot. at 15, citing Op. at 21. The SAC specifically alleges Biogen's payments to distort the generics' placement vis-à-vis *Vumerity*.

- Biogen tied enhanced rebates on Tecfidera, which had a much larger sales base, to the PBMs' giving preferred formulary placement to Vumerity. *Id*. ¶¶ 397-98. The tactic drove an enormous uptake of Vumerity which, until then, had achieved only the 1% share of sales that it deserved on its own (lack of) merit. *Id*. ¶ 398. Leveraging sales of the old product to bolster sales of the new one plainly supports a market-switch claim.[29]

- Through the utilization-management and specialty-pharmacy tactics discussed above, Biogen impaired generic Tecfidera's competition with Vumerity as well as with Tecfidera. *Id*. ¶¶ 391-93. Biogen notes that Vumerity was also designated a specialty drug and subjected to utilization management. Mot. at 15-16. But the SAC alleges that Vumerity received that treatment based on its astronomical price and that "no legitimate rationale can explain" that treatment of the low-cost generic Tecfidera. SAC ¶¶ 260-61, 274-78. Absent Biogen's kickbacks, generic Tecfidera would not have had these designations on *any* formularies and would have had a distinct competitive advantage over Vumerity. *Id*. ¶ 282.

- Biogen undermined generic Tecfidera's price advantage over Vumerity by giving cost-share coupons to members who used Vumerity, like those it gave to users of Tecfidera. *Id*. ¶¶ 394-95.[30]

---

[29] *See, e.g.*, *id.* at 542.
[30] *See, e.g.*, *Loestrin*, 433 F. Supp. 3d at 331 ("patient savings" program supported finding of coercion).

The Court considers all these tactics holistically and synergistically,[31] which is exactly how Biogen's executives described them. SAC ¶¶ 330. Courts routinely deny motions to dismiss market-switch claims based on monopolists' schemes less comprehensive and coercive than Biogen's.[32]

Biogen's market switch had the intended substantial anticompetitive effect. Without the unlawful switch, Vumerity would have achieved, at most, less than 5% of fumarate (Tecfidera, generic Tecfidera, and Vumerity) sales. Biogen's tactics quintupled the sales to 25%, costing purchasers more than $655 million per year. *Id*. ¶ 307.

Biogen nevertheless suggests that Plaintiffs must allege "foreclosure" of 40% to 50% of the market. Mot. 19. Except possibly in the Third Circuit, courts do not apply a foreclosure analysis to market-switch claims. Biogen cites *Namenda* (Mot. at 19), but that Court noted that plaintiff need only prove that the switch "has the effect of significantly reducing usage of rivals' products and hence protecting its own monopoly." *Namenda*, 787 F.3d at 655 (cleaned up). No foreclosure requirement applies because Biogen impaired competition not by depriving generic-drug manufacturers of sufficient scale, but by using the bevy of anticompetitive tactics just discussed. Likewise, no magic percent of affected formularies was necessary to cause an anticompetitive effect. *See* Op. at 16. A sufficient volume of generics was available in the market to make the generics vastly cheaper than the brand; the problem was that Biogen prevented the low-cost generics from actually being dispensed. Regardless, the 60+ point reduction in the generics' share here would meet any foreclosure standard that might apply. *See, e.g.*, *Suboxone*, 622 F. Supp. 3d at 58 (45-point reduction meets Third Circuit standard).

---

[31] *See, e.g., Blue Cross*, 712 F. Supp. 3d at 543 (tactics "considered together" sufficiently pleaded coercion); *Suboxone*, 622 F. Supp. 3d at 48-49 (same); *Loestrin*, 433 F. Supp. 3d at 331 (same).

[32] *See, e.g.*, *Indivior*, 681 F. Supp. 3d at 286; *Blue Cross*, 712 F. Supp. 3d at 543; *Loestrin*, 433 F. Supp. 3d at 331; *Keurig*, 383 F. Supp. 3d at 240; *In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 270 (D. Mass. 2017); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2016 WL 4992690, *9 (S.D.N.Y. Sept. 13, 2016); *In re Solodyn Antitrust Litig.*, 2015 WL 5458570, *12-13, *21 (D. Mass. Sept. 16, 2015); *Suboxone*, 64 F. Supp. 3d at 682-83.

### C. PLAINTIFFS PLAUSIBLY ALLEGE A SHERMAN ACT SECTION 2 OVERALL-SCHEME CLAIM.

Biogen barely mentions Counts Four and Nine of the SAC, which allege that Biogen monopolized the market through an overall anticompetitive scheme. In such a claim "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).[33] Even if, for example, the market switch were not unlawful standing alone—it is—the Court would still evaluate it as part of the overall scheme.[34] A monopolist's overall scheme can be unlawful even if, unlike here, *none* of its elements is independently unlawful.[35] Here, nearly every one of them is.

All the scheme's elements worked together to impair competition from generic Tecfidera. Biogen's payments to disadvantage generic Tecfidera on formulary tiers and to designate it a specialty drug rigged members' cost-share obligations, masking the generics' far lower prices; so did Biogen's cost-share coupons, obscuring price signals even when the formularies did not; the payments to impose step edits and prior authorizations directly impaired dispensing the generic regardless of member cost-sharing; and the whole purpose of the market-switch was to permanently defeat competition from generic Tecfidera by switching sales to a product for which the generics are not automatically substitutable.

---

[33] *See also, e.g.*, *In re Suboxone*, 967 F.3d 264, 270 (3d Cir. 2020); *State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 908–09 (C.D. Ill. 1990), *aff'd sub nom. State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469 (7th Cir. 1991); *Clark Equip. Co. v. Lift Parts Mfg. Co.*, 1986 WL 4423, at *1 (N.D. Ill. Apr. 8, 1986); *Sanitation Equip. Ltd. v. Thetford Corp.*, 1984 WL 820, at *1 (N.D. Ill. June 28, 1984); *In re Suboxone Antitrust Litig.*, 2017 WL 36371, at *8 (E.D. Pa. Jan. 4, 2017).

[34] *See, e.g.*, *Blue Cross*, 712 F. Supp. 3d at 540 (market-switch that was not independently unlawful supported claim of overall scheme to monopolize); *Asacol*, 233 F. Supp. at 270 (same).

[35] *See, e.g.*, *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir 1980); *SanDisk Corp. v. Kingston Tech. Co.*, 2010 WL 11595034, at *7 (W.D. Wis. Nov. 15, 2010). Biogen cites *Kleen Products LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 844 (N.D. Ill. 2017), but the issue there was sufficient evidence to infer the existence of an agreement, not evaluating the synergistic effects of elements of an overall scheme to monopolize. *See* Mot. at 14.

### D. ILLINOIS BRICK DOES NOT BAR PLAINTIFFS' ROBINSON-PATMAN OR RICO CLAIMS.

The Court previously observed that there was "a path that avoids issues with *Illinois Brick*, to the extent Plaintiffs' scheme is based on Biogen and PBMs agreeing to manipulate formularies." Op. at 24. Plaintiffs' Robinson-Patman Section 2(c) and RICO claims follow that path.

To start, "*Illinois Brick* does not stand for the proposition, as [Biogen] would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002).[36] *Illinois Brick*'s facts and reasoning are critical in determining when its indirect-purchaser rule bars a claim. "The facts of *Illinois Brick* illustrate the rule." *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019).

In *Illinois Brick Co. v. Ill.*, 431 U.S. 720, 727 (1977), all the price-fixed products that the plaintiff bought had been sold and re-sold by others in the distribution chain before the plaintiff bought them. The Court dismissed the plaintiff's damage claim for lack of standing because it did not purchase products directly from the alleged antitrust violators. The Court grounded the decision in: (1) the risk of duplicative recoveries if everyone in the distribution chain can assert federal antitrust damage claims based on a passed-on overcharge; (2) evidentiary complexities for downstream purchasers proving damages; and (3) a desire to incentivize private enforcement by giving direct purchasers the right to full recovery. *Id.* at 731-732, 735.

Under *Illinois Brick*, "a downstream plaintiff cannot sue an alleged monopolist or cartel member [for damages] on a theory that a middleman passed an anticompetitive overcharge on to her." Op. at 23 (quoting *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020)). Absent those circumstances, *Illinois Brick* does not bar the plaintiff's claim. *See John Deere & Co. Repair Serv.*

---

[36] *See also id.* at 474 ("The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did not sell to them. Rather, it was because the defendants did sell to a third party who ... could recover for any injury they claimed.").

*Antitrust Litig.*, 703 F. Supp. 3d 862, 877 (N.D. Ill. 2023) ("Without the chain of distribution paradigm where some charge is being passed on from a direct purchaser to an indirect purchaser, the rationales underpinning *Illinois Brick* … lose their bite").

The facts at issue in Plaintiffs' Section 2(c) and RICO claims differ markedly from the *Illinois Brick* paradigm. Start with Section 2(c), which prohibits sellers from bribing intermediaries that act on behalf of buyers. Plaintiffs' Section 2(c) claim alleges that Biogen paid undisclosed bribes to the PBMs, which were intermediaries acting on behalf of health plan clients. SAC ¶¶ 521-26. It also alleges that the PBMs owed fiduciary duties to those clients. *Id.* ¶¶ 525, 530. In violation of those duties, the PBMs accepted Biogen's bribe payments in exchange for rigging the formulary placement and specialty-drug designations of the fumarate products, benefitting Biogen while raising costs for the PBMs' health plan clients. *Id.* ¶¶ 527-36. Biogen's conduct targeted the *health plans*' purchases to raise the *health plans'* costs, and the PBMs abandoned their duties to the *health plans*. For the Section 2(c) claim, Plaintiffs and other health plans were the targets of Biogen's conduct and the first, if not the only,[37] entities that suffered the injury that Section 2(c) seeks to prevent—corruption of the relationship between the buyer and the intermediary acting on the buyer's behalf. *See* Op. at 25. Plaintiffs' Section 2(c) claim is not based on Biogen harming wholesalers or pharmacies, then having those wholesalers or pharmacies pass on that harm to the health plans by selling products at higher prices. The claim is therefore outside *Illinois Brick*.[38]

The same is true for Plaintiffs' RICO claim. The predicate act for Plaintiffs' RICO claim is Biogen's violation of 18 U.S.C. § 1954(4), which prohibits making bribes or other conflict-of-interest

---

[37] Some plan members were also injured by Biogen's conduct, such as through paying higher cost-shares for generic Tecfidera. Those members' injuries do not affect the *Illinois Brick* analysis because Plaintiffs' Section 2(c) and RICO claims do not depend on the members' passing on their injuries to the health plans by re-selling products at higher prices.

[38] In fact, on a Section 2(c) claim, Plaintiffs have the option of collecting damages equal to the amount of the bribes, which is another reason why the claim falls outside the *Illinois Brick* paradigm. *See Grace v. E.J. Kozin Co.*, 538 F.2d 170, 172, 175 (7th Cir. 1976).

payments to a service provider of an ERISA plan[39] with the intent to influence any plan actions or decisions. Plaintiffs' RICO claim alleges that Biogen made payments to PBMs, which provide services to *ERISA plans*, for the purpose of improperly influencing the *ERISA plans'* formulary decisions in violation of Section 1954. *See* SAC ¶¶ 118, 543-46, 570-85. For the RICO claim, Plaintiffs and the other members of the ERISA-plan subclass were the targets of Biogen's conduct and the first and only entities that suffered the injury that Section 1954(4) seeks to prevent—corruption of the relationship between the ERISA plan and its service providers. *See U.S. v. Soures*, 736 F.2d 87, 89 (3d Cir. 1984) (Section 1954 intended to protect ERISA plans from "all conflict-of-interest payments"). Again, because the RICO claim is not based on wholesalers or pharmacies passing on injuries to health plans by reselling products at higher prices, *Illinois Brick* does not apply.

*Deere* illustrates the point. There a tractor manufacturer conspired with independently owned private dealerships to inflate the price of repair services for the manufacturer's tractors. 703 F. Supp. 3d at 876. Plaintiffs were farmers who bought repair services at allegedly inflated prices. The court held that *Illinois Brick* did not apply because the farmers were among the first buyers who were injured by the alleged conspiracy. *Id.* at 879; *see also id.* at 877 (facts alleged were a "far cry from the paradigm alleged in *Illinois Brick*, where there was a manufacturer, multiple middlemen and an ultimate consumer").

### E. PLAINTIFFS PLAUSIBLY ALLEGE A ROBINSON-PATMAN ACT SECTION 2(C) CLAIM.

#### 1. The PBMs Breached Fiduciary Duties to Their Health-Plan Clients.

The Court previously dismissed Plaintiffs' Robinson-Patman Act ("RPA") Section 2(c) claim because it did not sufficiently allege that PBMs owe a common-law fiduciary duty to their health-plan clients. Specifically, the Court found that Plaintiffs' prior allegations, unlike those in *In re EpiPen Direct*

---

[39] Unlike Section 2(c) of the RPA, liability under 18 U.S.C. § 1954 does not depend on a fiduciary duty between the ERISA plan and the service provider. *See Palmeri*, 630 F.2d at 200-201.

*Purchaser Litig.*, 2021 WL 147166 (D. Minn. Jan. 15, 2021) ("*EpiPen*"), and *In re Express Scripts, Inc. PBM Litig.*, 522 F. Supp. 2d 1132, 1144-45 (E.D. Mo. 2007) ("*Express Scripts*"), had not identified specific marketing statements "to support the inference that [the PBMs] held themselves out as trustworthy experts in formulary design." Op. at 28.

In *EpiPen*, the court relied on PBMs'[40] statements that they would "align their interests and/or act in the best interest of their clients" and that they were "uniquely positioned" to achieve lower costs. 2021 WL 147166 at *18. In *Express Scripts*, the PBM had pledged to "align [its] interest with those of our clients and their members," "leverag[e] volume to deliver discounts for clients," and "aggressively promote generic drugs and lower-cost brand name drugs." 522 F. Supp. 2d at 1145 n.10.

The SAC alleges specific marketing statements that exceed those found sufficient in *EpiPen* and *Express Scripts*. SAC ¶¶ 158-62. The SAC identifies the PBMs' multiple marketing statements that the PBMs: (1) align their interests with their health plan clients and negotiate on their behalf[41]; (2) are uniquely positioned to lower costs because of their expertise[42]; and (3) use formulary management to generate competition to lower drug costs and promote generics and biosimilars over higher priced alternatives.[43] The collective statements by each of the PBMs go well beyond an ordinary service provider's "claim[] to have the best interest of his clients in mind." *See* Op. at 28.

Biogen reaches beyond the SAC to argue that because PBMs include fiduciary disclaimers in their contracts with health plans, Plaintiffs cannot state a Section 2(c) claim as a matter of law. Mot. at 27. Biogen is wrong for three reasons. First, a "boilerplate disclaimer" is not determinative of when special circumstances give rise to a common law fiduciary duty. *See Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 588-91 (2011) (discussing cases). Second, "[c]ontracts do not exist in a vacuum; their terms must

---

[40] The PBM defendants in *EpiPen*—Express Scripts, CVS Caremark, and OptumRx—are all named as co-conspirators here.

[41] *See, e.g.*, SAC ¶¶ 158(a)-(c), (e); 159(a), (i)-(j); 160(a), (e); 162(a), (c)-(d), (i)-(k).

[42] *See, e.g.*, *id.* ¶¶ 158(d); 159(a); 160(c)-(d); 162(b).

[43] *See, e.g.*, *id.* ¶¶ 158(g)-(h); 159(c)-(l), (p)-(v); 160(b); 161(a); 162(e).

be understood in light of the commercial context in which they were drawn." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 985 (N.D. Ill. 2005). The contracts themselves and their commercial context are not part of the record, so Biogen's argument is premature on a motion to dismiss. Third, it has long been the law that contractual disclaimers are unenforceable with respect to prospective antitrust violations. *See Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 179-80 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the anti-trust statutes against another would be to that extent void as against public policy."). Biogen's asserted contractual disclaimers of fiduciary duty cannot prevent Plaintiffs from advancing claims under the RPA, which is an antitrust statute.[44] In sum, the mere presence of boilerplate disclaimers does not change the fact that Plaintiffs have plausibly alleged that the PBMs owe fiduciary duties to their health plan clients, and the Section 2(c) claim should now proceed.

### 2. Biogen's Payments to the PBMs Crossed the Buyer-Seller Line.

Biogen offers two arguments why its payments to the PBMs purportedly did not cross the "buyer-seller line." Mot. at 27. Both are meritless.

Biogen asserts that its payments did not cross the buyer-seller line because PBMs do not "take title to drugs." Mot. at 27-28. Biogen's argument misunderstands the PBMs' role in the transactions. Plaintiffs allege that the PBMs are intermediaries acting on behalf of their health-plan clients. SAC ¶¶ 156-62. Nothing in Section 2(c) conditions liability on an intermediary's itself taking title to goods and then reselling them to its client buyer.

In a variation on that theme, Biogen asserts that Plaintiffs and other health plans are not buyers of prescription drugs because they do not take title to the drugs. Mot. at 28. Biogen ignores a host of authority

---

[44] The RPA is an antitrust law, so the Seventh Circuit holds that "standards under the Robinson-Patman Act should be conformed to standards under other antitrust laws." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1404-05 (7th Cir. 1989); *see also Great Atl. & Pac. Tea Co., Inc. v. FTC*, 440 U.S. 69, 80 n.13 (1979) ("the Robinson-Patman Act should be construed consistently with the broader policies of the antitrust laws"); *Jefferson Cnty. Pharm. Ass'n Inc. v. Abbott Labs.*, 460 U.S. 150, 157 (1983) (RPA is an antitrust law).

24

holding that health plans are considered buyers of prescription drugs under the antitrust laws. *See Brillhart v. Mut. Med. Ins., Inc.*, 768, F.2d 196, 199 (7th Cir. 1985) (insurer Blue Shield was buyer of prescription drugs and medical services for plan subscribers; citing cases); *Feldman v. Health Care Serv. Corp.*, 562 F. Supp. 941, 947 (N.D. Ill. 1982) ("Each federal court which has examined the question in the context of the antitrust laws has decided that an insurer paying out pursuant to its policy of insurance is actually a purchaser of goods or services").[45] Section 2(c) is an antitrust law, so the same conclusion applies.[46] *See supra* at n. 44.

### F. PLAINTIFFS STATE A RICO CLAIM BASED ON 18 U.S.C. § 1954(4).

Aside from *Illinois Brick*, Biogen challenges two aspects of Plaintiffs' RICO claim: (1) the "common purpose" requirement and (2) the "operation or management" requirement. Both arguments rest on mischaracterizing the SAC. According to Biogen, the SAC alleges nothing more than "ordinary commercial conduct" and "industry standard interactions." Mot. at 28, 30.

The SAC tells a very different story, and its allegations control. Plaintiffs allege that Biogen and its co-conspirators *deviated* from the standard practice of PBMs using formulary placement to promote the use of lower-cost generics over higher-cost branded drugs. SAC ¶¶ 544-46, 560, 569, 576, 580-83. Plaintiffs allege that Biogen's payments to the PBMs *corrupted* the normal process for formulary placement and designating specialty drugs. *See, e.g., id.* ¶¶ 581-83. As explained below, the SAC's

---

[45] *Accord In re Lorazepam & Clorazepate Antitrust Litig.*, 531 F. Supp. 2d 82, 90 (D.D.C. 2008) ("Although the physician prescribes, the pharmacist dispenses, and the patient takes the medication, in most cases, *it is the insurer such as Plaintiffs who actually pay* … Plaintiffs were the buyers from and customers of Defendants…") (emphasis in original); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 1994); *Kartell v Blue Shield of Mass., Inc.*, 749 F.2d 922, 926 (1st Cir. 1984); *Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*, 675 F.2d 502, 505 (2d Cir.1982); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 881 F. Supp. 1309 (W.D. Wis. 1994); *Mich. State Podiatry Ass'n v. Blue Cross & Blue Shield of Mich.*, 671 F. Supp. 1139, 1152 (E.D. Mich. 1987).

[46] Biogen's one case adopting a different view is inapposite. *See Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 385 (E.D.N.Y. 2007). In *Drug Mart*, the court was concerned that treating insurers as "end-user purchasers" would effectively exempt the health care industry from the RPA's provisions on price discrimination. *Id.* at 402. No such concern exists here for Section 2(c).

allegations track *EpiPen* and other cases holding that plaintiffs can state a RICO claim based on schemes involving drugmaker payments to PBMs for improper formulary placements.

### 1. Each Biogen-PBM Pricing Enterprise Had a Common Purpose.

Plaintiffs allege that Biogen formed association-in-fact enterprises with each of the Co-Conspirator PBMs. SAC ¶ 541. An association-in-fact enterprise requires only three elements: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946 (2009). Those three requirements are "broadly defined and not especially rigorous." *Exeed Indus., LLC v. Younis*, 2016 WL 128063, at *5 (N.D. Ill. Jan. 12, 2016); *see also Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 686 (N.D. Ill. 2012) ("In *Boyle*, the United States Supreme Court defined a RICO enterprise broadly").

Biogen focuses only on the requirement that enterprise's members have a "common purpose." Mot. at 28, quoting *Boyle*, 556 U.S. at 948. The SAC meets that standard. Plaintiffs allege that in each Biogen-PBM Pricing Enterprise, Biogen and the PBM shared the common purpose of deriving secret profits from the bribery scheme that suppressed competition from generic Tecfidera. SAC ¶¶ 550-54, 569. The allegations track prior case law finding that drug manufacturers and PBMs shared a common purpose in other alleged bribery-for-formulary-placement schemes. *See EpiPen*, 2021 WL 147166, at *9 (EpiPen manufacturer allegedly "paid higher rebates to each PBM Defendant in exchange both for favorable formulary placement and to ensure that PBMs would not police its price increases"); *In re Insulin Pricing Litig.*, 2019 WL 643709, at *6 (D.N.J. Feb. 15, 2019); *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 205-06 (D. Mass. 2004) ("*AWP*").

Biogen offers its own spin on those allegations, arguing that Plaintiffs merely describe "ordinary commercial conduct" where Biogen and the PBMs were pursuing their "individual self-interest." Mot. at 28-29. Biogen not only mischaracterizes the SAC, but also recycles the same argument that other courts have rejected on similar facts. *See EpiPen*, 2021 WL 147166, at *9 (rejecting argument that there was no

common purpose because manufacturer and PBMs pursued "divergent goals"); *Insulin*, 2019 WL 643709, at *6 (rejecting argument "that PBMs and manufacturers cannot have a common purpose in the RICO enterprise because they play different roles in the distribution chain").

Like the arguments rejected in those cases, Biogen's rosy interpretation of the SAC rests on "allegations about how PBMs were *supposed to function*, not how their business activities were allegedly corrupted here." *EpiPen*, 2021 WL 147166, at *9. Had the PBMs "played their typical gatekeeping role" and used their formularies to promote low-cost generic Tecfidera over higher-cost Tecfidera and Vumerity, the PBMs would not have made decisions that benefitted Biogen at the expense of the PBMs' ERISA plan clients. *See id.* at *12. What distinguishes Biogen's payments is that they induced the PBMs to do the opposite of what the PBMs ordinarily would do, which is promote the use of the lower-cost generic Tecfidera. SAC ¶¶ 544-46, 560, 569, 576, 580-83. Accordingly, Biogen's payments to the PBMs were not ordinary business transactions; they caused the PBMs to act "outside the bounds of the parties' normal commercial relationships." *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849, 855-56 (7th Cir. 2013).

Biogen also questions the plausibility of the alleged bribery scheme because PBMs are supposed to compete with each other on cost. Mot. at 29. The SAC, however, explains that the PBM industry is highly concentrated and that ERISA plans cannot detect formulary mismanagement, especially with respect to individual drugs. SAC ¶¶ 163-173, 175. Further, Biogen asserts without citing authority that it is implausible for Biogen to bribe five different PBMs without an agreement among all of them. Mot. at 29. But *EpiPen, Insulin*, and *AWP* all hold otherwise, as each alleged unlawful separate enterprises between a brand manufacturer and each of multiple PBMs, without alleging that the PBMs agreed with one another. *AWP*, 307 F. Supp. 2d at 201, 205 (sustaining allegations of separate Manufacturer-PBM pricing enterprises in case involving 42 manufacturers, 4 PBMs); *accord EpiPen*, 2021 WL 147166, at *9 (1 manufacturer, 3 PBMs); *Insulin*, 2019 WL 643709 at *2-3 (3 manufacturers, 3 PBMs).

**2. Biogen Participated in the Operation or Management of the Biogen-PBM Pricing Enterprises.**

RICO liability arises when the defendants "participate in the conduct of the enterprise itself," as opposed to conducting "their own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); Mot. at 30. Biogen disputes that Plaintiffs meet that element, again arguing that the SAC merely alleges that Biogen was "going about its own business" and engaging in "industry standard interactions." Mot. at 30. Again, the SAC alleges the opposite, so Biogen's discussion of *United Food* (Mot. at 30) is inapposite.

Moreover, "bribery is a recognized means of participating in the conduct of an enterprise's affairs." *EpiPen*, 2021 WL 147166 at *12 (citing cases). Indeed, the Supreme Court in *Reves* gave bribery as an example of how one might operate or manage an enterprise. 507 U.S. at 184; *see also Aetna Cas. & Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1560 (1st Cir. 1994) (defendant who paid bribes and defendant who received them each controlled enterprise); *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 275 (D. Conn. 2004) ("Giving a bribe can be tantamount to gaining a management position within the enterprise, because the insider taking the bribes acts under the direction of the outsider giving them in conducting the affairs of the RICO enterprise"). The SAC alleges that Biogen bribed the PBMs, so Plaintiffs satisfy RICO's operation and management requirement. SAC ¶¶ 543-46, 550-58, 566-69, 579-83.

**G. PLAINTIFFS PLAUSIBLY ALLEGE ANTITRUST STANDING FOR INJUNCTIVE RELIEF.**

Biogen's arguments seeking dismissal of Plaintiffs' federal claims for injunctive relief (Mot. at 12-13) defy black-letter law that *Illinois Brick*'s direct-purchaser rule applies only to damages relief.[47] *See U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) ("the direct-purchaser doctrine does not foreclose equitable relief"); *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 640 n. 7 (N.D.

---

[47] On November 25, 2025, the parties filed a Stipulation that moots Biogen's arguments under *Illinois Brick* regarding Plaintiffs' standing to pursue damages as direct purchasers under Sections 1 and 2 of the Sherman Act. *See* ECF No. 128.

Ill. 2022) ("*Illinois Brick* only applies to suits for damages").[48] The rule does not apply because, among other reasons, claims for injunctive relief present no risk of double recovery. *Gypsum*, 350 F.3d at 627.

Plaintiffs have also adequately pled that Biogen's conduct harmed competition itself. *See In re Rail Freight Fuel Surcharge Antitrust Litig.,* 593 F. Supp. 2d at 41. The SAC alleges that Biogen impaired competition between its branded fumarates and generic Tecfidera, causing Plaintiffs and Class members to pay overcharges. That is classic antitrust injury for which federal law provides equitable relief. *Id*. Biogen nevertheless asserts that Plaintiffs' injury lacks sufficient "directness" to support standing for injunctive relief. Mot. at 12-13. Even if there were "far more direct victims" (Mot. at 13)—there are none—Plaintiffs would still have standing to seek an injunction. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814 (N.D. Ill. 2017) (being "down the distribution chain does not raise the concern at issue in *Associated General Contractors* … when damages are sought" so "Indirect Plaintiffs have sufficiently pled standing to seek an injunction under the Sherman Act"). Regardless of whether "there are more 'immediate victims' of the [alleged] scheme," a plaintiff has standing for injunctive relief so long as its injury is "directly attributable to the conspiracy." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 456-57 (E.D. Pa. 2018). While *AGC* presents a multi-factor test to determine antitrust standing, "the factors [it] identified that relate to damages are not relevant to standing to seek injunctive relief." *Id.* at 456-57 (*quoting In re Broiler Chicken*, 290 F. Supp. 3d at 813).

Biogen nevertheless asserts that Plaintiffs' injury lacks sufficient "directness" to support standing for injunctive relief. Mot. at 12-13. Even if there were "far more direct victims" (Mot. at 13)—there are none—Plaintiffs would still have standing to seek an injunction. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 814 (N.D. Ill. 2017) (being "down the distribution chain does not raise the concern

---

[48] *See also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 593 F. Supp. 2d 29, 41-43 (D.D.C. 2008), *aff'd sub nom. Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444 (D.C. Cir. 2010) ("Defendants' challenges to these allegations are essentially that plaintiffs purchased . . . indirectly, a fact which, . . . does not, . . . invalidate their claims for injunctive relief.").

at issue in *Associated General Contractors* … when damages are sought" so "Indirect Plaintiffs have sufficiently pled standing to seek an injunction under the Sherman Act"). Regardless of whether "there are more 'immediate victims' of the [alleged] scheme," a plaintiff has standing for injunctive relief so long as its injury is "directly attributable to the conspiracy." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 456-57 (E.D. Pa. 2018). While *AGC* presents a multi-factor test to determine antitrust standing, "the factors [it] identified that relate to damages are not relevant to standing to seek injunctive relief." *Id.* at 456-57 (*quoting In re Broiler Chicken*, 290 F. Supp. 3d at 813).

The SAC plainly alleges that Plaintiffs' injuries are directly attributable to Biogen's conduct. Plaintiffs thus have standing to pursue injunctive relief even if others in the distribution chain also do.

Further, Biogen does not explain how "intermediaries nearer to Biogen in the supply chain" have a more direct injury with respect to Plaintiffs' Section 2(c) and RICO claims. Mot. at 13. As alleged, the purpose and effect of Biogen's bribes was to manipulate health plans' formularies, thereby causing health plans to pay more for fumarate drugs. Biogen and the PBMs' scheme directly targeted health and ERISA plans, not wholesalers or pharmacies. *See, e.g.*, SAC ¶¶ 543, 583.

Biogen's cited authority is inapposite. The court in Biogen's lead case, *Loc. Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201-02 (7th Cir. 1986), determined that the plaintiff did not have standing because it was actually "profiting from the antitrust violation itself." Plaintiffs here did not benefit from Biogen's misconduct. Biogen's other cases do not support its argument.[49]

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny Biogen's Motion to Dismiss in its entirety.

---

[49] *See Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007) (plaintiffs had standing to assert RICO claims because plaintiffs were injured by auction manipulation scheme); *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 739-40 (3d Cir. 2004) (not discussing plaintiff's standing to pursue injunctive relief); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, *12 (N.D. Ill. Aug. 23, 2013) ("[T]he allegedly price-fixed products (commodities/futures contracts) are not even components of the products that plaintiffs purchased. Plaintiffs' injury, . . . occurred in a market secondary to the allegedly monopolized market and occurred only after the spot cheese commodity evolved, eventually, into a finished … product.").

Dated: November 25, 2025

Respectfully submitted,

*/s/ Joseph M. Vanek*
Joseph M. Vanek
Paul E. Slater
John P. Bjork
SPERLING KENNY NACHWALTER, LLC
321 N Clark Street, Suite 2500
Chicago, Illinois 60603
Tel: (312) 641-3200
jvanek@sperlingkenny.com
pes@sperlingkenny.com
jbjork@sperlingkenny.com

Phillip F. Cramer
SPERLING KENNY NACHWALTER, LLC
1221 Broadway, Suite 2140
Nashville, TN 37212
Tel: (312) 641-3200
Fax: (312) 641-6492
pcramer@sperlingkenny.com

James Almon
SPERLING KENNY NACHWALTER, LLC
1616-D Metropolitan Cir.
Tallahassee, FL 32308
Tel: (850) 942-4334
jalmon@sperlingkenny.com

Kathryn B. Allen
SPERLING KENNY NACHWALTER, LLC
9600 Great Hills Trail, Suite 150W
Austin, TX 78759
Tel: (512) 587-7732
kallen@sperlingkenny.com

Ryan T. Holt (TN BPR # 30191)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Ave., Suite 1750
Nashville, Tennessee 37203
Tel: (615) 742-4200
rholt@srvhlaw.com

Steve D. Shadowen
Nicholas W. Shadowen
HILLIARD & SHADOWEN LLP
1717 W. 6th St., Ste. 290
Austin, Texas 78703
steve@hilliardshadowenlaw.com
nshadowen@hilliardshadowelaw.com

*Counsel for Plaintiff Local No. 1 Health Fund, Teamsters Local 237 Welfare Fund, Teamsters Local 237 Retirees' Benefit Fund, and the Proposed Class*

Lee Albert
Brian Brooks
GLANCY PRONGAY & MURRAY LLP
230 Park Ave., Suite 358
New York. NY 10169
Tel.: (212) 682-5340
lalbert@glancylaw.com
bbrooks@glancylaw.com

*Counsel for Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund, Jacksonville Police Officers and Fire Fighters Health Insurance Trust, and the Proposed Class*

Carol V. Gilden
ARDC No. 6185530
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel: (312) 357-0370
cgilden@cohenmilstein.com

Sharon K. Robertson
Mary F. Brown
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
srobertson@cohenmilstein.com
mabrown@cohenmilstein.com

*Counsel for Plaintiff the Mayor and City Council of Baltimore, and the Proposed Class*

32

Gregory S. Asciolla
Geralyn J. Trujillo
Alexander E. Barnett
Jonathan S. Crevier
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel: (646) 933-1000
gasciolla@dicellolevitt.com
gtrujillo@dicellolevitt.com
abarnett@dicellolevitt.com
jcrevier@dicellolevitt.com

*Attorneys for Plaintiff UFCW Local 1500 Welfare and the Proposed Class*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on November 25, 2025, a true and accurate copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois by filing through the CM/ECF system, which served a copy upon all counsel of record.

*/s/ Joseph M. Vanek*

34